UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

Docket No. _____

| | |
|---|---|
| MR. AND MS. DOE, both individually and on behalf of their minor daughter, JANE DOE, | ) ) ) |
| | ) |
| Plaintiffs | ) ) |
| v. | ) ) |
| REGIONAL SCHOOL UNIT 21, DR. TERRI COOPER, and ANITA BERNHARDT, | ) ) ) ) |
| Defendants | ) ) |

**COMPLAINT**
**(Injunctive Relief Requested)**

Plaintiffs Mr. and Ms. Doe, individually and on behalf of their minor

daughter, Jane Doe, complain against Defendants RSU 21, Dr. Terri Cooper,

and Anita Bernhardt, as follows:

**PARTIES AND JURISDICTION**

1.     Plaintiffs Mr. and Ms. Doe and their minor daughter, Jane Doe,

are residents of Kennebunk, Maine.

2.     Defendant RSU 21 ("RSU 21" or the "District") is the local

education agency responsible for providing a public education to the age-

eligible residents of Arundel, Kennebunk, and Kennebunkport, Maine.

1

3.      Defendant Dr. Terri Cooper is the superintendent of RSU 21; Defendant Anita Bernhardt is the assistant superintendent.

4.      RSU 21 is a recipient of federal financial assistance for purposes of Section 504 of the Rehabilitation Act and a public entity for purposes of the Americans with Disabilities Act.

5.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331; 29 U.S.C. § 794; and 42 U.S.C. § 12133.

## FACTS COMMON TO ALL COUNTS

6.      Jane Doe is an eleven-year-old student in sixth-grade. She is a resident of Kennebunk, Maine and is currently enrolled at the Middle School of the Kennebunks ("MSK").

7.      For her entire life, Jane has exhibited social anxiety. This anxiety has especially hindered her in new situations, such as meeting new people and trying new things.

8.      In 2021, Jane's pediatrician diagnosed her with social anxiety disorder (social phobia).

9.      Thanks to efforts by her parents to prepare and guide her through new situations, along with encouragement from friends, Jane was able to manage her social anxiety through elementary school.

10.     During elementary school, she participated in softball, which became one of her passions.

2

11.    Jane and her parents moved to Kennebunk from Somerville, MA in September 2021, as she was starting fourth grade.

12.    For fourth grade, Jane enrolled at Sea Road School in Kennebunk ("Sea Road"). Jane's parents notified the District of her social anxiety diagnosis.

13.    Jane's parents prepared her for fourth grade by arranging a private tour of Sea Road before the first day of school. During the tour she met the principal, Cory Steere, who offered to assign a teacher who would work well with Jane given her anxiety disorder.

14.    Due in large part to this advanced preparation, Jane thrived at Sea Road during fourth and fifth grades, making many friends and enjoying her teachers. She loved going to school.

15.    During summer 2023, Ms. Doe learned that RSU 21 planned to move the time slot for elementary school band to conflict with recess or morning meeting, thereby cutting the time for band instruction from 45 to 30 minutes. RSU 21 claimed that this reduction would "protect core classes" and would not compromise "instructional time."

16.    Mr. Doe had grown up playing in band, and Ms. Doe had also had a major interest in the arts in school. Ms. Doe felt strongly that RSU 21 was making a mistake by cutting time for band and moving band instruction to the only unstructured time that students otherwise would have.

3

17.     Ms. Doe learned that some other parents, teachers, and staff in the district felt the same way about the proposed cuts to band.

18.     On August 8, 2023, the Portland Press Herald published an opinion column from Ms. Doe, in which she argued against the change regarding band. She urged her fellow citizens to "hold the administration and [school] board accountable" for this decision.[1] A modified version of the Press Herald piece appeared on September 6th in the Kennebunk Post.

19.     In her column, Ms. Doe encouraged students and former students to protest the proposed cutting of time for band:

> Maybe kids will be heard. TikTok kids get stuff done. Write letters. Get involved. Students and former students who want to say something about education and the immeasurable impact arts have on them – get your bucket. Say it now, as loud and confidently as you can.

20.     Aside from her newspaper column, Ms. Doe also sent five emails to the school board about the band issue, but she received no responses that addressed her concerns.

21.     In July and August 2023, Ms. Doe attended two school board meetings to request a response, but neither the school board nor the superintendent answered her concerns.

---

[1] Ms. Doe's August 8th opinion piece from the Portland Press-Herald is available at https://www.pressherald.com/2023/08/08/maine-voices-rsu-21s-plan-to-cut-music-teachers-time-hits-sour-note/.

22.     In August 2023, Jane was preparing to begin sixth grade at a new school, MSK.

23.     Aware of Jane's social anxiety, her parents sought to prepare her for MSK, just as they had successfully done when she started at Sea Road.

24.     During the summer of 2023, MSK went through a period of disorganization. It was unable to provide correct schedules to its incoming students. Twice in August, MSK's principal emailed parents to apologize for scheduling glitches and explain that the school was training new staff members in the scheduling department.

25.     When the first day of school arrived, Jane's parents had no idea what to expect. Other than the name of Jane's homeroom teacher, they did not know the identity of her teachers or where she should go.

26.     Jane took the bus to and from MSK on the first day of school, August 28, 2023.

27.     After returning home, her parents observed that she was uncharacteristically quiet and becoming more and more anxious.

28.     On the following morning, August 29, Jane exhibited anxiety around taking the bus to school. Ms. Doe observed that her anxiety was preventing her from leaving the house.

29.    Jane's best friend was in her homeroom. Ms. Doe believed that if she could get Jane to the school to see her friend, she would feel better and be able to get through the school day.

30.    Ms. Doe proposed that Jane take the bus and promised to follow the bus in her car and meet Jane at the school. Jane reluctantly agreed and got on the bus.

31.    Ms. Doe arrived at the school before Jane's bus. She entered the building and encountered a man at the front door she believed to be a teacher. Ms. Doe alerted him that a student coming off bus 7 might be in distress.

32.    The person to whom Ms. Doe was speaking was in fact the school's principal, Marty Bouchard.

33.    Ms. Doe also told the school resource officer and the assistant principal, Luke Myers, that Jane might come off bus 7, see her car, and run to it, experiencing a panic attack, and they should allow her to do so. They promised to send Jane to her mother.

34.    Jane emerged from the bus and started to walk into MSK, but she could not continue. She saw her mother's car, ran across the parking lot, and climbed into the backseat. Ms. Doe brought her home to take a break.

35.    Jane went to her room and used colored pencils to write a handwritten letter to Principal Bouchard:

6

Dear Mr. Bouchard

I know Maine RSU21 stopped online learning but the online aspect realy helped me. I'm am one of a handful of kids who realy struggle in a school envirment, espesaly with new trasitions. Wether being bullied – or having painic atacks, I think a hybrid learning idea would **help.**

I understand it might be hard to juggle, with band – and little teachers but when hybrid stopped, some students were cut off. And also I personally feel alot safer at home.

Please consider this
Your student [JANE]

36.    Jane shared the letter with her parents. They were proud of her for advocating for herself. They knew, however, that she was expected at school and that there were rules about attendance.

37.    Ms. Doe tried to bring Jane to school at 9:00am. When they arrived at the school, they entered the building together. Jane collapsed to the floor in the school lobby. She was frozen in place, shaking, and could not move.

38.    Brian Grant, a guidance counselor at MSK, was in the lobby that morning. Working together, he and Ms. Doe were able to get Jane up to his room in the school after about 20-30 minutes.

39.    Mr. Grant and Ms. Doe tried multiple times over the next two-and-a-half hours to get Jane to go to class. Each time, however, she would collapse to the floor, unable to leave Mr. Grant's room.

7

40.    Ms. Doe remembered Jane's note to Principal Bouchard. She asked Mr. Grant to invite the principal up so Jane could deliver the note to him personally. Mr. Grant said no but promised to deliver the note.

41.    Finally, around midday, Ms. Doe drove Jane home. Jane's parents had never before seen Jane exhibit such severe anxiety symptoms.

42.    The next day, August 30, 2023, Ms. Doe brought Jane to school and attempted to help her enter the building. Jane began to have a panic attack and could not enter the school. Ms. Doe ended up bringing her home.

43.    Upon arriving home, Ms. Doe emailed Mr. Grant, Principal Bouchard, and Jane's homeroom and social studies teacher, Thomas Taylor, copying Mr. Doe (collectively referred to hereafter as "Team Jane"). She addressed the group as "Team [Jane]":

> [Jane]'s anxiety is such that she says she wants to be in school but can't get in the door because she's too overwhelmed, hence the panic attacks yesterday, and the one we headed off this morning. I knew it wasn't going to work as soon as her best friend came over and tried to get her to go, and [Jane] was unresponsive. A reinforcer is only a reinforcer (which [Jane's best friend] usually is!) if someone is under a threshold of stress to be able to find it reinforcing.
>
> She couldn't even take a single step with her bestie. I knew at that point she was up against a wall and anything else to push her was going to result in us watching her repetitively fall off a cliff, like yesterday.

44.     Ms. Doe's email also stated that Jane would be seeing her pediatrician to explore the possibility of short-term anxiety medication for her.

45.     Mr. Doe emailed Team Jane to notify them that Jane would be seeing her pediatrician that very day and would not be in school.

46.     That evening, Mr. Doe emailed Team Jane again to request a Section 504 team meeting for her as soon as possible:

> After discussing with [Jane]'s doctor today, the immediate plan is to attend for the end of the day Thursday (Social Studies/ homeroom). I will sign [Jane] in and bring her to class at 12:45 so that she can arrive before the other students. We will assess how this works and determine the plan for after Labor Day accordingly.
>
> We also need to meet and establish a 504 plan and any other support as soon as possible. [Jane] has expressed some level of comfort with Mr Taylor so it would be great if he can participate in the 504 plan discussion. I have attached a letter from [Jane]'s doctor that recommends this course of action as well as excusing [Jane]'s absence today. Please let me know when we can meet.
>
> We are working on getting some outside help for Jane as her anxiety has elevated beyond previously manageable levels. If there is therapy/counseling available through the school we can discuss that as well.

47.     Heading into September, Jane's anxiety was preventing her from attending school for the entire day. The Does brought her to school only for last period social studies with Mr. Taylor on Thursday, August 31st, and every day starting Tuesday, September 5th, after the Labor Day Weekend.

48.     Jane had some success with these brief appearances for social studies class. She also attended a few other end-of-day classes, such as art and chorus.

49.     Her parents' strategy was to acclimate her to school with these isolated classes, with the goal of slowly moving her to full school days.

50.     On September 13, 2023, Mr. Grant made a referral for Jane under Section 504 of the Rehabilitation Act, which provides eligible students with disability-related accommodations.

51.     On the referral form, under question 2a ("Briefly describe the areas of concern for this student"), Mr. Grant wrote: "Anxiety preventing regular school attendance."

52.     The following day, September 14, 2023, Jane's parents attended a 504 Plan meeting with Team Jane. Jane was also present. Ms. Doe shared with the 504 Team that Jane had experienced panic attacks in response to anticipating school or attending school.

53.     The Does provided the team with a letter from Jane's pediatrician, Dr. Michelle Lock, which provided Jane's diagnosis of anxiety disorder.

54.     Mr. Grant's minutes from the September 14 meeting document that Dr. Lock's letter fulfilled the need for documentation and that Jane's anxiety rendered her eligible for a 504 Plan of accommodations:

10

[Jane]'s communicating, learning, concentrating, thinking, breathing and interacting with others are being impacted by her anxiety. Except for breathing, the remaining have a substantial or severe impact. Due to [Jane] being substantially or severely impacted by her anxiety, it was determined that she is eligible for a 504 with an accompanying plan including accommodations.

55.   The District offered Jane three accommodations: providing her with work when absent, allowing her access to designated people and spaces as needed, and allowing her to draw or doodle during class. None of these accommodations directly addressed her inability to attend full school days.

56.   On September 15, 2023, Ms. Doe brought Jane to school in the morning, but Jane sat in the car, too anxious to enter the school building. Ms. Doe emailed Team Jane from the parking lot: "We're outside and[] she can't go forward. I'm at a loss."

57.   Mr. Grant and Mr. Taylor each emailed back, expressing their sympathy for Jane. Ms. Doe responded:

It's not the schedule- it's the anxiety now. I fear nothing we do without medical support will be effective.

She's so sensitized now to even the alarm predicting she's going to school and having stomach aches before we even leave that the anxiety process is in motion long before we even get to the school.

And once she's there, she gets stuck.

I'll call her pediatrician today and see what we can do.

This is, I suspect, in the medical realm now.

11

58.     Her parents brought her to Boston to see her pediatrician that day. Later that afternoon, Ms. Doe emailed Team Jane and reiterated Jane's request for online learning to transition her back to the classroom:

> [We] are driving back from Boston after seeing [Jane]'s pediatrician. We are going to try anti-anxiety medication to see if we can increase her stress threshold. We'll keep y'all posted on Monday as soon as we know what's going on.
>
> If there is ever an option to have a laptop with zoom on it in her chair in some of these classes to help her intro in and slide in hybrid style for a couple weeks, we're up for it as a transitional tool.

59.     On September 18, 2023, Jane tried to enter the school building, but her anxiety prevented her from doing so once again.

60.     That morning Ms. Doe emailed Mr. Taylor (Jane's homeroom teacher) and Mr. Grant:

> Even with drugs on board, we had a mild attack but still struggling. She hid in the backseat when Brian came over to the car to check in. Took about 10 minutes to come out from the floor . . .
>
> We've been out in this parking lot for over an hour—she's able to communicate a little more than last week- "my stomach hurts. I really want to go in but I can't just yet. My body and brain won't let me. I want to go to Spanish. I can't get there."
>
> She is trying so hard to the point she's making herself physically sick.

61.     In that same email, Ms. Doe renewed her request that the school allow Jane to integrate into the classroom virtually:

I know it was off the table three weeks ago but I'm now going to formally request consideration for virtual integration in classes so she can acclimate to class structure as a stepping stone. I think we should try this as we continue exploring options (and wait for the 4-6 weeks for the SSRI meds to kick in).

I know so many kids flailed with virtual, but for kids like her who thrived, it can be a lifeline. Our kids who are bullied, kids with their first period, kids who have a bit of a cold but are able to learn—lots of reasons to have this as an option as a spot treatment for integration or just not missing school when they can do school but not the people-y part.

62.   Ms. Doe clarified that she was not looking for separate lesson plans for Jane nor did she seek a permanent virtual option. Jane needed a short period of virtual learning to ease her back into the classroom in person:

She won't need additional classroom support, or a different lesson. She can attend classes, see on the inside How it goes, and integrate as the meds kick in. She can then get a feel for the daily schedule, then slide in as the meds start working - and she can stop feeling like she's being left behind.

As a teacher, I hated coming up with lesson plans suited for online learning because it is different. but given this isn't a long time solution or option, and potentially part of a behavior plan, that's not going to be necessary. It's a tool we can hopefully use so she can see what it's like and slowly integrate.

While sitting in the parking lot is a good desensitization plan, she's still missing out on everything else that she can [do] and is capable of doing.

63.   Ms. Doe stressed that, although they had tried several things to help Jane, they had yet to try what Jane herself had suggested in writing at the beginning of the school year, which was virtual learning:

13

I'm hopeful we can at least consider this option–we're throwing a lot of spaghetti at the wall to see what sticks, and yet we haven't done the thing she told all of us would help her on day one. I was reluctant to push for it because I thought she'd get in the building. It's never been this bad before. Looking back, she gave us the answer weeks ago with that letter to Mr. Bouchard.

64.     Principal Bouchard replied later that day:

Mr. Grant forwarded your email and your request for a virtual option for [Jane]. We are not currently offering virtual options for students in RSU 21. We are more than happy to discuss other modified options for [Jane] including partial days, altered scheduling, scheduling changes, etc. I am also appreciative of the nice note [Jane] wrote me, however, at this time I do not have the ability to offer virtual learning.

Hoping we can work together to find the best solution for [Jane]!

65.     Ms. Doe wrote back to elevate her request to the district level:

I guess I'm just frustrated because we are doing our best with partial days and we can't even get in—so get partial days are still a net zero. She needs smaller steps.

We are going into 4th week of school, and we'll be missing potential another 4-6 until the medications kick in. That puts her over two months behind. Y'all are doing everything you can, we're doing everything, and this seems like a much simpler, temporary fix for most parties without putting her further behind the 8 ball.

I guess I sound like I'm begging because I am. When I thought back to her note after our meeting, it was the first time I realized there was a glimmer of hope for her to integrate more smoothly in tandem with the meds. . . . I'm hoping for flexibility on this because I know this can work and she won't have to keep suffering and falling behind as we build up to full integration.

It's so hard as a parent to watch her fall off a cliff every day for school—something she loves, and we have to keep making her go through this—crumpled in the back seat, making herself sick—

aside from a horse tranquilizer I'm at a loss. Our lives are fully on hold and this has been stressful for everyone on her team and in her home. Her world is so small right now and we are desperate.

We all used this kind of tech for a year (She did for 2). It's almost more frustrating knowing there is a tool that can help her that connects the world every day- and that the accessibility tool that would be most beneficial to her, by her own words, is inaccessible in the place it would help her the most. That makes me feel even more helpless as a parent.

If anything changes, please let me know—or if there is someone at the district level that I can petition to, since it sounds like a district policy and not an MSK policy. Which, I'm not mad at you for the policy. I'm baffled and frustrated after Covid the tool everyone used is just gone as if it never happened. The door to access her learning is closed, and that is a harder pill to swallow than the ones she's taking to try to get in the classroom.

66.     Principal Bouchard responded the following day:

Thank you for being so communicative and I am SO very sorry we are not able to offer a virtual option. This is the same across all of the RSU 21 schools right now. We will continue to be steadfast in our efforts to support [Jane] and your family!

67.     Ms. Doe persisted, asking Principal Bouchard again about whom she could approach at the district level to get Jane this accommodation, which she likened to a wheelchair ramp for full access to the school building:

Thanks, Marty—and I totally appreciate that's not something that is not presently offered. The way I'm looking at it is she needs it. So, who do I need to speak with to change this policy or find a way to make it available to her so she can be an active participant in school? This tool is not unlike a wheelchair ramp to have full access to her learning.

15

School board meetings are all online and offer virtual participation. The tech exists. She has a computer—one the district gave to her. She needs access to that technology. Some classrooms in other buildings are allowed air conditioners for kids who have particular needs in their learning environment even though they are not allowed in every room. This is no different. Who do I speak with to get her this accessibility tool or change the policy so kids like her don't get left behind?

If this is an ADA thing (which it's starting to feel like to me), point me in the right direction. If this is an administrative thing, point me in the right direction. I'm not asking you to change the rules for her—I'm asking you point me in the direction of who can so I can get her what she needs to have full access to her learning, something she desperately wants, and something she needs. There are only some many times in a day she can do math facts - and trust me, she's doing them, but we can all agree she needs more.

And this isn't an angry letter—not coming at you—I know you and everyone on this list are in full support of us and our kid, and all of you would do the same for yours, especially when it's something that is - on the outset, right there within reach. The last thing we need is in 6 weeks for her to finally have the confidence to get in the classrooms only to be set back by not knowing her teachers, her classmates, the school day structure or the baseline information to advance her skills.

Just please, tell me where to go and I'll take it from there.

68.     Principal Bouchard responded on September 21, 2023, that

Ms. Doe should approach Dr. Terri Cooper, the District's superintendent:

Very sorry for the late reply. I am very hopeful the medication works and we can quickly have [Jane] be able to attend MSK.

As far as the decision around no virtual classes at this time, it is a district decision. My boss is the superintendent of schools, Dr. Terri Cooper. I have let her know about your request already. Please keep us posted on progress and when you believe [Jane]

16

may be ready to move forward with trying some of our classes in a modified format.

69.     Ms. Doe thanked the principal and updated him that Jane had

tried again that day to get into the classrooms but "froze in the hallway."

70.     Mr. Doe emailed Superintendent Cooper that afternoon:

Dear Dr. Cooper,

My daughter, [Jane Doe], is a 6th grader at Middle School of the Kennebunks. Transitioning to 6th grade has been beyond challenging for her. Her pediatrician has previously diagnosed her with anxiety, but while school and other life transitions have been difficult in the past she has been able to succeed with the support of some wonderful members of the Sea Road School community (Cory Steere, Elizabeth Thompson, Emily Phillips).

This year her anxiety has worsened—she has attended less than two days of school in total this year—and her pediatrician recommended that we discuss a 504 plan with the middle school. We met with staff at MSK (Brian Grant, Marty Bouchard) and determined [Jane]'s eligibility for 504 plan accommodations. The staff and teachers have been very understanding and helpful (Tom Taylor and the entire Cadillac team have been great!) to the extent that they are able (e.g., modifying [Jane]'s schedule, allowing us to escort her into the school, providing flexibility to sign out of class and go to a "safe space" when needed), but they have been limited by district policy in providing accommodations that could be truly helpful for [Jane]. So far, even with the 504 plan in place, [Jane]'s disability has prevented her from attending school.

[Jane] herself at the beginning of the year advocated for what she thought would be most helpful and wrote a letter to Principal Bouchard requesting some form of online learning to assist in her transition. Unlike some children who struggled with online school during Covid-19, [Jane] found it a helpful means to manage her anxiety. It allowed her to gradually build comfort with teachers and classmates without being thrown into the deep end to sink or

17

swim, and allowed her to keep learning and progressing. "Learning loss" may be a valid concern in the aggregate, but [Jane] continued to exceed grade level averages on standardized testing both during and after the pandemic. All kids are different.

We are doing everything we can as parents to help our daughter. She has begun medication under the supervision of her pediatrician, but it takes time to find the right medication and dosage. She is in therapy to try to work through her challenges and develop coping mechanisms, but this is also a process that takes time. We are doing our best to stay in touch with her teachers and keep her engaged with her learning from home in preparation for the time when she can get in the school building. It is not enough. [Jane] needs help building comfort and trust with her teachers and the school environment, and her condition doesn't allow her to do that from inside the building currently.

We have been told that district policy does not allow for virtual learning. While I can understand this as a general policy, we are asking for consideration with respect to disability accommodation. We are NOT looking for a full virtual school option, separate curriculum, or anything of that nature. We are simply asking for a livestream of some sort to enable [Jane] to stay engaged with school, limit her falling behind, and most importantly allow her to build confidence so that she can transition to attending school IN PERSON.

I understand that it can be difficult to balance the needs of the school district writ large with the needs of individual students, but I know that you value equity and inclusion, and I believe that you want all students to succeed. I am hoping that it is in this spirit that you will consider our request to allow MSK to make additional accommodations for [Jane] as needed, even if they are in conflict with district policy. [Jane]'s anxiety may not allow her to express it, but she would be extremely grateful for your help.

Sincerely,
[Mr. Doe]

71.    Neither Superintendent Cooper nor anyone on her staff responded to Mr. Doe's written request for accommodation.

72.    On September 21, 2023, the Kennebunk Post published a letter to the editor from Erin Nadeau, a member of the RSU 21 School Board, addressing Ms. Doe's September 6th column about RSU 21's reduction in band.

73.    Ms. Nadeau accused Ms. Doe of spreading "misinformation" and insinuated that Ms. Doe had accused the board of "setting kids up to fail."

74.    After four days with no answer from the superintendent, Ms. Doe emailed MSK's Special Education Director, Rachel Bratter, and Assistant Director of Special Services, William Putnam, on September 25, 2023:

> Hello Ms. Bratter, Mr. Putnam and school staff,
>
> As we head into the 18th day of missed instruction for my daughter, [Jane Doe], we are increasingly concerned about her access to the general education curriculum and to instruction from a certified educator to work towards grade level standards. Due to her diagnosis of Social Phobia and Separation Anxiety (provided to her 504 team—Brian Grant, Marty Bouchard and Tom Taylor on September 14) she was given a 504 in order to assist her with accommodations to access the classroom. Despite our rigorous efforts as her parents to support her learning at home, including taking FMLA, daily attempts to integrate her into the building, and guiding her through Google Classroom assignments, she continues to be unable to access instruction from a general education teacher or the learning environment.
>
> When the team met to review eligibility for a 504 plan on September 14, 2023, it was determined that [Jane] qualified and would benefit from a system of support. Based on this, the team

19

developed accommodations in many areas that impacted [Jane]'s ability to be in the classroom, and we agreed upon a specific set of accommodations to help support her. ***We have yet to receive a copy of the official 504 plan or the minutes from the 504 meeting and are requesting these documents immediately so we can move forward with a suitable plan for [Jane] to access instructional time.*** Despite the outlined accommodations being attempted, and upon a request for further accommodations and support to help [Jane] access the building, we were informed that in order for [Jane] to access the ADA accommodations, she would have to enter the building. Our understanding from this response is that [Jane] is only permitted to her education and supports towards that education once she enters the building, despite her disability precluding this remedy. Unfortunately, as [Jane] is a student in a public school with a 504 plan, this is not an option and RSU 21 continues to be responsible to educate [Jane] in all areas of general education.

Our request for virtual access to her classrooms while she integrates into the building has been denied by the 504 team due to district policy prohibiting virtual access to classrooms, which we as her parents find unreasonable. We were instructed to reach out to the Superintendent of RSU 21 to request virtual access, as it is our understanding district policy falls under her purview.

As we have not had reciprocal communication regarding our request (email on 9/21/23 to Superintendent, Dr. Terri Cooper) for remote instruction, and have not been informed as to how our child will be accessing a Free Appropriate Public Education, we are reaching out to confirm the ChildFind obligations of RSU 21. We are seeking to ensure that our child is being adequately instructed and if there are suspicions of a disability that impedes her ability to access the curriculum and general education classroom, that an evaluation will be conducted in order to ascertain deficits and to define appropriate evidence-based interventions to support [Jane] in her learning journey.

Therefore, we are requesting a referral to special education in the suspected area of disability of Other Health Impairment, due to [Jane]'s multiple diagnoses of anxiety as well as the academic and behavioral data from the beginning of the 2023/2024 school

year. Since August 29, 2023, [Jane] has not received daily instruction, and most of her Google Classrooms to access supplementary materials were not given until at least two weeks after school had started; and, some Google Classroom materials are not yet available. At this point in the school year, she has received nearly all instruction from her parents, who are not certified teachers and she has had no instructional outreach from teachers to provide assessments or baseline curriculum measures that are standard practice in the beginning of each year. Without these measures or ones similar in nature, we are unable to determine where [Jane]'s current level of performance is in both academic and social-emotional areas.

Moving forward, we will need to be informed of how RSU 21 will support [Jane] in accessing the classroom, who will be providing the instruction and what other 504 accommodations will be provided as her current 504 plan is insufficient.

Our referral for special education is requested to be discussed in person as is our right, and we look forward to a meeting within 15 days.

75.     Ms. Bratter responded that someone would be in touch with them soon about a special education referral.

76.     Meanwhile, on September 25, Jane's parents had a phone call with Tara Skiff, a school psychologist who works for the District. During this conversation, the Does reiterated their request for remote learning for Jane.

77.     Ms. Skiff then emailed the Does to say the District was no longer offering remote learning options, but they had the option of homeschooling Jane:

As per our conversation I was able to get more information from administration regarding virtual learning. At this time, the State of Maine is no longer in a COVID emergency and no longer

21

providing remote learning options in public school. The option becomes if you wish for this type of learning you would need to withdraw [Jane] and "homeschool" with the option of a virtual learning school.

78.    Ms. Doe responded to say that they had no desire to homeschool

Jane and were looking for a plan to acclimate her to MSK's classrooms.

Meanwhile, they were concerned about how to get Jane access to school:

> But, we continue to be concerned about how she will access instructional time, which is legally owed.
>
> I'm voicing the concern here as we have worked diligently for 5 weeks, including taking FMLA, meds will take up to 4-6 weeks to get in her system (assuming they are the right medication, which they very well might not be), and she is fully capable of learning at home as she transitions into the classroom. Each passing day is another day of instructional time that she is otherwise fully capable of participating in, if only she could access it.
>
> So while I understand now we are focusing on getting her into the classroom and building, down the road in December if she's still not in the building, what then?
>
> I agree [Jane] needs to build relationships, which we have a plan with [Special Education Director] Rachel [Bratter] for tomorrow, and we may take you up on this, too. However, it's infuriating the one tool that everyone had access to, the one that would expedite this entire process, a tool that can stop her from suffering any longer, is out of reach for her to access her learning - learning that she wants. Something everyone else uses, including the school board for their meetings, it's not available as a transitional tool for a kid[] in this district to access her education, 5 weeks into the school year.
>
> I'm just putting that in writing so it's started somewhere that I'm advocating for this, and that the district is continuing to deny access to that tool.

22

I also understand that many of [Jane]'s helpers (like you) have their hands tied by district policy, and that is so upsetting to me, too.

79.  Ms. Skiff responded:

I am happy to hear you have a meeting with Rachel today. Please keep me updated on how I can help after the meeting. I will also keep in touch with Rachel. Our goal is for [Jane] to access her learning in school. As I stated earlier, we need a specific plan in place to help [Jane] transition into the school building and I am hopeful as a team we can create that plan.

80.  On the night of September 25, Ms. Doe attended a school board meeting. She took the podium and responded at length to school board member Erin Nadeau's accusations that she had spread misinformation about the District's decision regarding band. Ms. Doe corrected Ms. Nadeau on several points and then requested a public apology, which she never received.

81.  On September 26, 2023, Jane's parents attended an informal "meet and greet" with Special Education Director Bratter.

82.  While Jane's family toured the halls with Principal Bouchard and Rachel Bratter, another teacher observed Jane in distress and remarked, "I feel so bad." Principal Bouchard replied, "How do you think *I* feel? She wrote me a letter and I couldn't do what she asked me to do to help her."

83.  Jane's parents learned that Principal Bouchard had saved Jane's handwritten letter and kept it on his desk so he could see it each day.

84.     On September 27, 2023, Assistant Superintendent Anita

Bernhardt emailed Mr. Doe to deny his request for remote learning for Jane:

> Dr. Cooper shared with me your email expressing concerns for
> the participation of your daughter, [Jane], in middle school. In
> your email you shared your appreciation for the efforts made by
> the staff at Middle School of the Kennebunks and made the
> request to have [Jane] access virtually, at least some of her
> instruction at Middle School of the Kennebunks. In 2021, RSU 21
> made the decision to return to in person learning for our
> students. When weighing the experiences for students in the
> classroom, students at home and teaching staff, we determined
> this decision is the right choice for our district. We continue to
> stand by that decision.
>
> I realize that this is not the message you were hoping to receive.
> We will continue to partner with you and your family through the
> 504 process to find strategies that can support [Jane]'s successful
> participation in Grade 6.

85.     On September 29, 2023, Jane's therapist, Karen Matthews of

Wayfinder Wellness and Psychotherapy Services, wrote a letter stating

Jane's diagnoses: Separation Anxiety Disorder (F93.0), and Social Anxiety

Disorder (F40.10) with differential diagnosis of Panic Disorder. These new

diagnoses had only emerged in fall 2023 as she struggled with school

attendance.

86.     Jane's parents had shared these diagnoses with Team Jane on

September 14, but also shared Ms. Matthews' letter with the District.

87.     On September 30, 2023, Jane had a softball game. She loved softball and had played for many years with great enjoyment. It was her favorite sport, and her parents considered it her "happy place."

88.     Historically, even if Jane were experiencing anxiety in other areas of her life, she always had been able to play softball without hesitation. During the September 30 game, however, Jane became so overwhelmed with panic that she could not take the field. She sat, unable to move until the final inning of the game, when she finally managed to participate.

89.     In late September, Jane's parents viewed social media posts from another family in RSU 21. The posts contained photographs of a child using a telepresence robot, which allowed the child to remotely control the robot's movements inside the school building and use it to view his classroom, attend classes, and interact with classmates and teachers through a video screen.

90.     Jane's parents learned that the child was using the robot at Kennebunk Elementary School, which is in RSU 21. Ms. Doe spoke to teachers at Kennebunk Elementary, who told her they had seen the robot being used in the school.

91.     On October 2, 2023, Jane and her parents were scheduled to meet with Special Education Director Rachel Bratter. Before the meeting, Ms. Doe went to Principal Bouchard's office to speak with him.

92.    Ms. Doe asked Principal Bouchard if he would be willing to follow the suggestion of Jane's former principal about setting her up with a Zoom link in the MSK building so privacy concerns would not be an issue.

93.    She told Principal Bouchard that Principal Steere had suggested that Jane could even set up this link in his building (the elementary school) and two of Jane's former teachers indicated that they could make her a "cozy nook" in their classrooms if it would help Jane get a zoom link.

94.    Principal Bouchard became uncomfortable and told Ms. Doe that he would get fired if he agreed to any such measures. He also told Ms. Doe that she would be putting Jane's teachers in a "bad position" if she were to ask them independently to allow a zoom link in their classes.

95.    At their scheduled meeting, Ms. Bratter told Jane's parents that Jane had no need for a special education evaluation:

> So the special education referral piece—you've made it clear that the academics is not concerned, that her actual being able to do the academics isn't a concern. So as far as the special education piece is concerned, there isn't anything to do evaluations on. We already know that she can physically do the work and we already know that she has a medical diagnosis, so special education would not be the appropriate direction to go in. Her 504 is appropriate based on what her medical diagnosis is and things like that.

96.    Ms. Bratter also stated that the Does needed to contact Dr. Cooper with their requests: "[Y]ou would have to go to the superintendent

specifically for remote access to school. That's a district decision I can't override."

97.    Mr. Doe interjected that the District *was* in fact allowing remote learning for other students:

> We know for a fact that this district does allow that accommodation for some students. We know for a fact that other districts accommodate students, other districts do it. So it seems like it's reasonable based on that standard. I need to understand why it's not a reasonable accommodation.

98.    Ms. Bratter insisted that the District was not giving any student remote access to a classroom, nor would it be willing to do so. The teachers' union was powerful, she explained, and it had prohibited any type of recording devices from being in District classrooms. "The district is a non-remote district," Ms. Bratter emphasized.

99.    Ms. Doe asked how that could be true when (1) there were numerous photographs of telepresence robots, including at Kennebunk Elementary School, and (2) teachers at Kennebunk Elementary were telling her that they had seen the robot in a shared hallway in the school. Ms. Bratter responded: "I don't know what they're talking about. But I'm in KES all day long. I can ask about it."

100.    When Jane's parents pressed her further, Ms. Bratter told them to bring the issue before the school board:

> I can feel your frustration. I can feel her frustration. I absolutely
> understand that. I do not have the authority to override the
> school board. You've been to a school board meeting. There's a lot
> more of them than there are with me. Whatever you are able to
> accomplish through Dr. Cooper and Anita and the school board.

101.    The RSU 21 School Board Policy and Procedure regulations specify that complaints should be "addressed as close to the problem as possible." For example, Rule KE states that problems involving "special areas such as special education, transportation, food service, etc. should be called to the attention of the administrator who has responsibility for that program."

102.    Rule KE continues that "if the complainant is not satisfied with the disposition of the complaint, the complainant may appeal to a higher level" and that "[i]f the issue has not been satisfactorily addressed the complainant may submit a written statement of complaint to the Superintendent." The District's rule states: "The Superintendent of Schools is generally the final source of appeal."

103.    Finally, the rule provides: "Should dissatisfaction remain after the above steps have been taken,"—in other words, if a complainant is still dissatisfied after a final appeal to the Superintendent—Rule KE requires the Superintendent and School Board Chair to review the issue and determine whether it should be placed on the school board agenda.

28

104.    This remedy of going before the school board after exhausting appeals with the Superintendent is echoed elsewhere in the RSU 21 board policy and procedure regulations:

> RSU 21 SCHOOL BOARD POLICY AND PROCEDURE
> SECTION B: BOARD GOVERNANCE AND OPERATIONS
> BEDH - PUBLIC PARTICIPATION AT SCHOOL BOARD
> MEETINGS
>
> 5. Any concerns about personnel matters and/or student matters should be directed to the Superintendent or another appropriate administrator outside of Board meetings so that they can be addressed through an alternative channel and in a manner consistent with privacy, confidentiality, and due process rights of the individuals involved.
>
> RSU 21 SCHOOL BOARD POLICY AND PROCEDURE
> SECTION B: BOARD GOVERNANCE AND OPERATIONS
> BDD - BOARD-SUPERINTENDENT RELATIONSHIP
>
> The Board, collectively and as individual members, shall:
>
> E. Refer complaints, criticisms, and requests to the Superintendent or other appropriate personnel and discuss them at Board meetings only after administrative solutions have been exhausted.

105.    On October 5, 2023, Superintendent Cooper attended a public forum about issues relating to public education, moderated by Sen. Joe Rafferty (Senate District 34), the Senate chair of the Joint Standing Committee on Education and Cultural Affairs.

106.    Mr. Doe attended the forum. Dr. Cooper still had not responded to his email from two weeks earlier.

107.    During the Q&A period, he addressed Dr. Cooper directly:

I'm actually concerned about students' mental health issues . . . it
seems like there's still a lot of barriers to students getting
supports and accommodations that they need to be successful in
school. We're currently in the sixth week of our school year
starting. My one daughter is still unable to attend class because
of her own issues. Despite having a 504 plan, she is continuing to
be denied accommodations that would help her be in the
classroom. These are accommodations that her therapist has
advocated for. Accommodations that we have talked to other
school districts about and they say yes, we would certainly do
that for children that had the same issues as your daughter has
in our school district. So six weeks, six weeks, my daughter's not
in school. She's not getting a public—I am a supporter of public
education—she's not getting access to her education. So I would
love to hear what Dr. Cooper has to say about that.

108.    Superintendent Cooper declined to answer, claiming she did not

know the situation, but said she would be "more than happy" to connect with

people at the school level about the issue.

109.    Mr. Doe said he had talked to "lots of people at the middle school"

and they had all been quite helpful. "The impression I get," he said, "is that

they are being told that they cannot do things from the district office."

Dr. Cooper replied: "Again, I don't know who you spoke to." She gave Mr. Doe

her email address so he could contact her.

110.    Mr. Doe responded: "I *have* contacted you and you have not

responded to me so that is why I'm here tonight." The Superintendent

promised to call him the following day, but she has never done so.

111.   Unable to access her classes, Jane began to fall behind her classmates academically. Her mother emailed Team Jane on October 16, 2023:

> [S]he got a homework assignment about C14. What is C14? That sounds like instructional time would have helped her answer the question . . . and division homework that we haven't done since the Clinton administration so we all got it wrong. This kid is falling behind, the administration will not give us the single tool that will actually help her integrate into her class . . . .

112.   Also on October 16, 2023, Ms. Doe went to a school board meeting. During the public comment period, she was recognized to speak. Before beginning she passed out papers to the school board members:

> I just handed out sixth grade homework questions from Google Classroom. Access on a computer the district gives every kid. You have to show your work, but here's the kicker: you don't have access to a teacher, so you have zero instruction and can't figure out what any of this means. How do you do it? This is my kid's reality for the last two months in RSU 21. She has no access to her teachers in what is clearly an ADA violation in this district. I'm here to get her and kids like her hope today. "We must protect instructional time." That was the mantra used by the superintendent to support cutting band by 33% in July. Once band was cut and kids had to choose between recess and recorders, protecting instructional time seems less important. You see, we have kids in our district and I can only speak to mine but I know there are others—

113.   At that point, school board member Erin Nadeau—the same person who had disparaged Ms. Doe in the Kennebunk Post—interrupted: "Point of order. We don't have specific comments about students."

31

114.   Ms. Doe replied: "This is a bigger problem about ADA and noncommunication by the superintendent." Another board member, Gayle Asmussen Spofford, addressed Ms. Doe: "I do have one procedural question. You know there's a path to filing a complaint. Have you taken the other steps? Because the board's supposed to be the last step."

115.   Ms. Doe replied: "We are so frustrated. And we have been trying to communicate with our superintendent, who will not respond back. And we have been trying to go through the DOE. And our kid is in crisis and we are here to get help."

116.   Ms. Spofford said: "You should submit that to the board with a list of the people that you contacted because we are the last gate to come through. And there's really nothing we can do. Until we have those pieces in place."

117.   Ms. Doe answered:

I believe we *have* been trying to go through the steps. We have contacted the DOE, we have contacted MPA or MPF whatever they're called. We have gone through a principal. We were trying to get help for a kid in crisis. And 10 days ago our superintendent said she would call my husband and has not.

118.   At that point Erin Nadeau interrupted again, saying:

I think this conversation needs to come offline and, and, as Gayle noted, we do need to have the steps that you've taken so that we understand what the process is to date. And again, is not to shut down your conversation but this is a confidential matter.

32

119.    Ms. Doe stated:

Can you guys at least understand why I'm standing here? I have reached out to the board and we have reached out to the superintendent and nobody will write us back. I've been at this podium since July about bands and nobody will write us back. Nobody will communicate back. That's why I'm here today.

120.    Ms. Spofford then whisked Ms. Doe away from the podium, out of the room, and into a hallway to discuss the matter.

121.    Later that night, on October 16, 2023, Ms. Doe emailed RSU 21's entire school board about the incident:

> I went tonight to plead for help for my kid, and the other kids like her in the district (and there are others) who cannot get help or an email response from our superintendent. We have gone through our principal, our 504 team, the special education department (who stated our kid should not be in the special education program and would not benefit from an IEP). We have then reached out to the superintendent and have never had a response from her. We did, weirdly get one from [the] assistant superintendent who was never copied on our initial email to Terri. My husband asked her at a public forum where she said, she didn't know about our case (which was a lie— she had known about us for weeks), and finished with, "We'll talk tomorrow" and it's been 10 days.
>
> No response.
>
> Our kid has missed 8 weeks of school as of today and our superintendent cannot even be bothered to respond to an email or "talk tomorrow." And she's the one who can help. That is why I went tonight. I am begging for help, an accessibility tool that y'all use for accessibility for school board meetings, for my kid who's instructional time is not prioritized or even accessible to her, yet the same excuse—

> "we must protect instructional time" was used to cut band
> by 33% and moved to recess.
>
> We have done literally everything to get her to see our kid,
> including now get escorted out of a school board meeting—
> that wasn't supposed to be on my Bingo Card—and I bet
> tomorrow, still crickets from our superintendent who
> stands in the gallery and says, "we pull every child in and
> meet them where they are." Not every. There are the ones
> outside the building who cannot get in. I guess they don't
> count.

122.   On October 18th, Ms. Nadeau emailed Ms. Doe, attempting to

reframe the incident as an "offer" to step out of the board room, even though

Ms. Doe had been given no choice but to leave the meeting room:

> Please know that the abrupt ending to your advocacy was
> not to curtail it, but to protect your child's privacy.
>
> I also want to emphasize that the end result of your
> advocacy during Monday's public comment was not that
> you were escorted out of the Board meeting.
>
> Gayle offered to step out of the Board room with you to
> provide information to you; the content of your comments
> could not be shared at that time, in that forum, because of
> confidentiality, as I noted during our meeting.

123.   Even though Ms. Doe had followed RSU 21 School Board Rule KE

by going to Jane's 504 team, then to Principal Bouchard, and finally through

a written statement of complaint to Superintendent Cooper (with no

response), Ms. Nadeau instructed her to address the issue with Jane's 504

team:

We are not allowed to entertain those types of conversations during public comment, and as much as we empathize with you wanting what you feel is best for your child, we are also not the subject matter experts in your family's situation, nor is it in our purview to take action on it. The conversation that needs to take place is between you and the team with whom you developed a plan for your child. If you do not agree with the plan developed, you have the right to file a dispute.

Because we are not the subject matter experts, I would look to the professionals on your team for both the conversation that needs to be opened, and next steps in the process if what you develop is not working.

124.   On October 24, 2023, Jane's parents attended a 504 Plan meeting. Also present at the meeting were 504 Coordinator Tara Skiff; Assistant Superintendent Anita Bernhardt; Special Education Director Rachel Bratter; Jane's 504 case manager, Brian Grant; Special Education Teacher Brooke Ireland; Social Worker Tracy Flagg; and Jane's therapist, Karen Matthews.

125.   Jane's parents were surprised to see Assistant Superintendent Bernhardt at the meeting. She had not been on the distribution list for the meeting invitation, nor was she part of Jane's 504 Team.

126.   During the meeting, Ms. Bratter did the exact opposite of what she had said during their October 2 meeting, recommending a referral for special education evaluation, which takes 45 school days to complete.

127.   Ms. Doe pointed out that, at their prior meeting, Ms. Bratter had stated that Jane would not qualify for special education: "What changed?"

128.   Ms. Bratter replied: "It's not that she's going to qualify or not qualify for special ed. In order for me to be able to do these evaluations, I have to move forward with the referral process. We can't do evaluations without moving forward with a referral." This was an abrupt change of position, as Ms.Bratter had indicated on October 2 that there was no legitimate reason to evaluate Jane for special education eligibility or services.

129.   Ms. Doe said, "We're so exhausted and she's exhausted and I don't know what these other tests are going to do when we've been telling you all along the things she needs: this remote access into that classroom, which is afforded to other kids in this district." Ms. Bratter replied: "That's a different conversation."

130.   Ms. Doe asked, "Why would that be a different conversation?" Ms. Bratter replied that remote access was not an option for any student in the district: "There are no student currently receiving remote access. There are absolutely no students receiving remote access."

131.   Ms. Doe responded:

The technology exists. And it exists for kids in this district. And my kid has never been offered it. It has never been put on the table. In the last meeting that we were here, you said, "Absolutely not, there's nothing that can do that in this district." Where there is a kid who does have it.

132.   Ms. Doe clarified again that they were not seeking a different curriculum or permanent remote access, but merely sought a way to

acclimate Jane remotely over a period of weeks, with the ultimate goal of getting her back in the classroom in person shortly. She showed Ms. Bratter online photos of other students using telepresence robots, saying that if Jane had had such a robot early in the year, she now would be attending school full-time.

133.   Ms. Bratter repeated that RSU 21 would need special education assessments to proceed but acknowledged that there are "some students that will have digital remote access due to medical things, and things like that."

134.   Ms. Doe had learned of a company called Grahamtastic Connection in Sanford, which provides services to students seeking remote access to education, including telepresence robots. Grahamtastic was the source of the telepresence robot used by the student at Kennebunk Elementary.

135.   A Facebook post, dated September 25, from the family of that student had two photographs side by side—the first picture was of a child alone in a room with his hand on a laptop keyboard, and the second picture was of the laptop's screen, which showed his robot's view of a school hallway. The caption said:

> [Student] got to drive his @grahamtasticconnection device thru the hallway at school today! When he was logging off all his classmates gave his robot a hug for him. It was so cute.

136.   Another Facebook post from that family from September 29 also had two photographs—the child's laptop screen, showing the robot's view of a note on a classroom bulletin board, and a closeup of the note itself, which said: "[Student's name]! Glad you are here! Please back up to join us. ♥Ms. Wells". The post's caption read:

> [Student's] teacher has this note for him when he logs onto his @grahamtasticconnection! It was the first time we'd seen it because his teacher usually has the robot turned around already!

137.   During the meeting on October 24, Ms. Bratter presented the hypothetical of what would happen if Grahamtastic were to provide the Does with a robot for Jane's use. In response to Ms. Bratter, Assistant Superintendent Bernhardt stated, "We would not allow that in their case."

138.   On October 25, 2023, Ms. Doe emailed Assistant Superintendent Bernhardt and Ms. Bratter to ask whether Jane could use the Grahamtastic technology to access her classroom:

> Hi Anita and Rachel – I just want to make sure I understand correctly about a conversational volley during yesterday's meeting.
>
> Do I understand the district has already decided they will not permit [Jane] use of a device and technology that other kids have access to in our district right now so they can access their peers, classroom, and stay connected while she continues to integrate fully into the classroom? Even though there is a device used in-district by kids in our schools right now, a grahamtastic robot, regardless of who controls the device, our child would be denied use of this tool or similar tools, even if we were to make a case with the company that handles them for our child's situation?

38

That our therapist, pediatrician, and everyone at the table a
month ago all agreed that exposure therapy through a 504 was
the right course of action, and specifically advised against
assessments and testing because it would be too much for [Jane]
and wouldn't change our course of action—and we are doing
exposure therapy based on the advice of her pediatrician and
therapist because remote access tools for integration purposes
is/was not available to her 9 weeks ago and has never been
available to her.

Do I understand this correctly? I appreciate any clarifications.

139.   Ms. Bratter sent the following message to Jane's parents:

As is appropriate under Section 504 we are following the 504
Team decision to provide exposure therapy through an
Alternative Education plan. [Jane] has demonstrated increasing
growth in her ability to access the middle school and staff in the
building as discussed at yesterday's 504 Alternative Education
review meeting. Our proposed next steps are to continue the
existing Alternative Education plan with revisions based on the
team discussion and, with your parental consent, to collect
additional data through the district IEP referral and evaluation
process. This data may provide important insights to assist the
team in escalating [Jane]'s progress and provide her with tools
for future success. Our steps as we continue to partner in our
support of [Jane] will be directed by the team decision-making
process for [Jane] under ADA.

140.   Ms. Doe responded on October 25: "Cool—can you answer the

question?" She copied and pasted the same question into her email, about

whether the District had decided not to permit Jane to use the Grahamtastic

robot, even though RSU 21 had allowed other students in the district to use

it.

141.   By October 31, 2023, no one from the District had responded,

prompting Ms. Doe to write again:

> Hi all, it's been a few days and I didn't want this to go without answers.
>
> In writing.
>
> I'll make it as easy as possible. Just yes or no answers, no fluff, to all of the below:
>
> Do I understand the district has already decided they will not permit [Jane] use of a device and technology that other kids have access to in our district right now so they can access their peers, classroom, and stay connected while she continues to integrate fully into the classroom?  Yes or no.
>
> There is a device used in-district by kids in our schools right now, a grahamtastic robot, regardless of who controls the device, our child would be denied use of this tool or similar tools by the district, even if we were to make a case with the company that handles them for our child's situation? Yes or no.
>
> That our therapist, pediatrician, and everyone at the table a month ago all agreed that exposure therapy through a 504 was the right course of action, and the team specifically advised against assessments and testing because it would be too much for [Jane] (unnecessary and potentially traumatizing was the language used then) and wouldn't change our course of action- yes or no.
>
> We are doing exposure therapy based on the advice of her pediatrician and therapist because remote access tools for integration purposes is/was not available to her now 10 weeks ago and has never been available to her. Yes or no.
>
> I would appreciate an expedient reply—simple yes or no— to each of the above, so [Mr. Doe] and I can decide if we should follow the district's change of course on the recommended plan for [Jane].

142.   On November 1, 2023, Ms. Doe emailed again:

Hi there! Me again—as it's been a week since I've asked these
questions with no direct answers to the questions I've asked, I'm
really hoping to get simple yes or nos to all of these. Please
respond today. They shouldn't be that hard as they seemed to be
a point of discussion in the meeting, and you seemed to have all
the answers in the meeting. I just need clarification to make sure
I'm understanding what happened. I'd appreciate a reply today.
It's been a week and we are eager to figure out how to proceed as
[Jane] is the one now 10 weeks out, suffering without
instructional time.

143.   Ms. Bratter responded, copying Superintendent Cooper:

These are great questions that should be reviewed and discussed
as a team. We are happy to schedule a Google Meeting next week
to provide additional clarification.

144.   Ms. Doe responded that a meeting was not needed:

I don't think it's necessary for a team meeting for this. These are
simple questions that are all Yes or No. We don't need to bother
the team with this. Can you please clarify in writing so I am no
longer confused as you and Anita were the ones to field these
questions, or similar, in the 504 meeting a week ago. Thank you.
Here they are again for your convenience. After a week of not
getting a simple yes or no, it's starting to look like the district
does not want to say anything in writing, which is concerning.
The first two questions can easily be answered.

145.   Ms. Bratter sent a reply email on November 2 in which she did

not answer the questions. Instead, she sent the minutes from the October 24

meeting and offered to hold yet another meeting:

I hope this message finds you well. I understand that you have
declined the offer for a meeting to address the specific questions

41

you have provided. Your concerns are important to us, and we want to ensure that we address them adequately.

I want to reassure you that we take your questions seriously and to provide you with the most accurate and detailed information, we have attached the meeting minutes from the most recent 504 review and IEP referral Meeting which were shared on October 30, 23.

Please review these meeting minutes as a written response to your questions based on the team discussion where these questions were originally addressed.

If, after reviewing the meeting minutes, you find it necessary to schedule a Team Google Meeting to further discuss any points or seek additional information, please do not hesitate to reach out.

We are here to support you.

Thank you for your patience and understanding as we work together to address your concerns thoroughly.

146.   Ms. Doe replied by email:

Rachel—Please make the following adjustments to the minutes that are inaccurate:

 "[Ms. Doe] stated [Jane] can do her academics and is capable of learning. [Ms. Doe] expressed frustration that a student at KES has remote learning. Rachel, Director of Special Services, explained that the district policies do not offer remote learning at this time. Rachel explained the situation related to the KES student and that student does not access remote learning. There are no students in RSU21 that access remote learning."

While semantically this is probably accurate-ish, I want this to be perfectly clear:  We have been, and always have been, pushing for REMOTE ACCLIMATION and remote access to her classroom—remote integration into her classroom so she can hear her teachers, participate socially and INTEGRATE into the classroom as part of her anxiety diagnoses, as part of exposure

42

therapy in the most expedient and kind manner for this child who has now (as of today) missed 11 weeks of instructional time and still is unable to access a classroom. All while we continue with physical, in person exposure therapy as part of a multi-pronged approach. Using a tool that other children can use in your district.

We do not, nor have we ever wanted, remote school or "remote learning" for [Jane] as the district understands the term. We have made that perfectly clear. The intention is, and always has been, to integrate her into the classroom using a tool that (we now know other kids have access to in this district despite conversations from you and the administration to the contrary) to keep them connected to their classrooms and teachers and community. That language must be clearer in these documents.

We are looking for remote ACCESS to her classrooms -like other kids in the district have—remote INTEGRATION so she can get into her seat as soon as possible as a 504 accommodation, and remote ACCLIMATION so she can be a full participant in her learning.

Please make those adjustments ASAP.

On November 9, 2023, Jane's pediatrician, Dr. Lock, wrote a letter of medical necessity. In her letter, Dr. Lock stated that it was medically necessary for Jane to have "video access into the classroom":
[Jane] is under my care for anxiety. Her next appointment in this office is 11/22/23 to discuss her medication management, and she continues under the care of a therapist. To date, [Jane] attends school for 1 hour daily with the support of the school social worker but is not attending any classes.

It is medically necessary for [Jane] to be provided with the following in order to effectively treat and/or manage this diagnosis:

All reasonable and appropriate accommodations to increase her familiarity with the school environment and allow for participation, including but not limited to the use of a full time

1:1 paraprofessional and video access into the classroom either from home or from school, to support the agreed-upon goal of full return to daily in-class participation as soon as possible.

147.   The Does provided Dr. Lock's letter to the District, stating: "We are asking you once again to please consider this accommodation request so that [Jane] can transition to full classroom participation as soon as possible."

148.   The District did not respond.

149.   Jane's parents then contacted Leslie Morissette, Founder and Executive Director at Grahamtastic Connection. Through a series of emails on November 13, 2023, Ms. Morissette confirmed that Grahamtastic had a robot available to be dropped off at Jane's school.

150.   Ms. Doe emailed Ms. Morissette: "We're curious if the district responded to you at all about [Jane]? We're obviously hopeful after a full 12 weeks to get her access to her classrooms so she can fully participate in person asap. She's eager to finally integrate into her classrooms, too!" Ms. Morissette responded:  "No response as yet, I will loop back with principal."

151.   On November 28, 2023, Ms. Doe emailed Principal Bouchard about the Grahamtastic paperwork:

Hi Marty!

On November 13, it's our understanding Grahamtastic sent paperwork so they could bring in assistive technology other students in RSU 21 have access to when they cannot be fully present in a classroom, on a temporary basis. It's also our understanding that Leslie from Grahamtastic followed up, you

44

sent another request to the district to address the paperwork for approval for [Jane].

When you sent the requests to the district, who was emailed? It's been weeks and as we know, every day the administration holds this paperwork up, [Jane] is still at a kitchen table or outside a classroom without a teacher or peers for the bulk of her time.

When I reached out to Grahamtastic today, Leslie said you followed up with the district—but they haven't responded. Can you let me know who was contacted in the district?

152.   Mr. Bouchard answered that he had forwarded the paperwork

along to Ms. Bratter, Assistant Superintendent Bernhardt, and

Superintendent Cooper:

I was asked to forward the email to Rachel Bratter, Anita Bernhardt and Dr. Cooper the day I received it and did so. Leslie did check in with me the other day, however, as I told her, I have not heard a response. I hope [Jane] has a great day!

153.   On November 28th, school psychologist Tara Skiff emailed Mr. Doe

about Dr. Lock's note regarding video access to the classroom:

I apologize that no one had responded in regards to this doctor's note. I did want to inform you that I have added this document into [Jane]'s 504 file for reference.

154.   Mr. Doe replied:

Thanks for adding it to the file. When can we expect a response regarding the indicated necessary accommodations (full time 1:1 paraprofessional and video access into the classroom)? It is almost three weeks since this was provided, and we have not received a response one way or the other.

155.   Ms. Skiff did not answer but offered to hold another meeting:

Thank you for the email. We can take the medical recommendations from the note you provided and discuss with [Jane]'s educational team, which is Section 504. The 504 team, which includes both of you, can have these discussions to make any changes to the plan, if warranted. Please let me know your availability within the next few weeks to schedule the meeting.

156.   On November 3, 2023, the District had given Jane's parents a form, asking them to consent to a special education evaluation, which Jane's 504 Team had discussed on October 2 and ruled out as "unnecessary" and "potentially traumatizing." The Does indicated on the form on November 30th that they did not consent to this evaluation.

157.   On December 1, 2023, Ms. Skiff invited Jane's parents to another 504 Team meeting, scheduled for December 19. The Does noticed that Assistant Superintendent Bernhardt had been invited, despite not being part of Jane's 504 team. Ms. Doe responded: "Anita Bernhardt is not part of [Jane]'s 504 team and we do not want her in attendance."

158.   Ms. Doe objected to the December 19 date, which ensured that Jane would be out of school for over four months.

159.   The District went forward with the 504 Team meeting on December 19 and the Does attended. They specifically requested a response to the medical necessity letter concerning Jane's need to be provided with remote access to her classrooms at MSK. Principal Bouchard replied that, per the superintendent and school board, RSU 21 will not permit virtual access.

46

160.   The 504 Team then informed the Does that, even though they have been entering MSK with Jane to assist her as "visitors" (checking her in and out of school during her limited attendance there), they would no longer be allowed to sign in and stay on the premises beginning in January and that Jane would have just five days to acclimate to full drop-off schedule. Principal Bouchard stated that things could "get ugly" if the Does do not comply. This edict from the District is likely to result in a disastrous setback for Jane, who struggles daily with the challenge of entering the MSK building.

161.   A typical school day at MSK runs from 7:30 am (9:00 am on Wednesdays) to 2:00 pm. Students attend six blocks of instruction per day, with core classes (math, language arts, science, and social studies) meeting daily. At the moment, Jane receives only 50 minutes of instruction per day, usually from the hallway without entering her classroom or seeing her teachers. Her panic attacks have been so bad that she cannot cross the threshold into most of her classrooms. The only classes she can currently enter successfully are Spanish, physical education and art. She eats her lunch in a private room with a single classmate as the cafeteria is too overwhelming, At most, she receives two blocks of instruction per day (1 hour and 40 minutes). The rest of the day she attempts to do work posted in Google Classroom from home, largely on her own.

47

162.   RSU 21's blanket denial of Jane's request for remote access to her classroom through a telepresence robot from Grahamtastic prevents her from having the accommodation she needs to access school due to her anxiety disorder and is causing Jane irreparable harm.

163.   Jane's pediatrician has provided a written statement to the District that Jane's anxiety makes it medically necessary for her to have remote access to transition back to in-person learning.

164.   By denying Jane the identical remote access utilized by other students in the District, Defendants are discriminating against Jane on the basis of her mental health disability.

165.   Part of Defendants' motive for this denial and for the edict that the Does not enter MSK with Jane is retaliation for Ms. Doe's written and oral advocacy around the issues of reductions in band instruction and the Does' continuing advocacy for Jane's disability-related needs to be addressed.

166.   Plaintiffs have no adequate remedy at law.


## COUNT I
### (Section 504 of the Rehabilitation Act, 29 U.S.C. § 794)

167.   Plaintiffs repeat the allegations in paragraphs 1 through 166.

168.   Section 504 of the Rehabilitation Act of 1973 prohibits recipients of federal financial assistance from engaging in intentional discrimination on

the basis of disability. 29 U.S.C. § 794 ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefit of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .")

169.   Jane is a qualified individual with a mental health disability under section 504. Defendant RSU 21 has regarded her as having a mental health disorder in the course of referring her for a Section 504 Plan.

170.   Defendant RSU 21, a recipient of federal financial assistance, has engaged in intentional discrimination by denying Jane remote access to her classroom, while providing such access to other students in the District.

171.   This action by Defendant RSU 21 amounts to discrimination on the basis of a mental health disability, in violation of section 504.

<u>**COUNT II**</u>
**(Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132)**

172.   Plaintiffs repeat the allegations in paragraphs 1 through 171.

173.   Title II of the Americans with Disabilities Act prohibits a public entity, including a public school district like Defendant RSU 21, from engaging in intentional discrimination on the basis of disability. 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.").

174.   Jane is a qualified individual with a mental health disability under the ADA. Defendant RSU 21 has regarded her as having a mental health disorder in the course of referring her for a Section 504 Plan.

175.   Defendant RSU 21, a public entity, has engaged in intentional discrimination by denying Jane remote access to her classroom, while providing such access to other students in the District.

176.   This action by Defendant RSU 21 amounts to discrimination on the basis of a mental health disability, in violation of Title II of the ADA.

## COUNT III
### (Violation of First Amendment Rights, 42 U.S.C. § 1983)

177.   Plaintiffs repeat the allegations in paragraphs 1 through 176.

178.   The First Amendment to the U.S. Constitution guarantees the right to free speech and the right to petition the government for redress of grievances.

179.   42 U.S.C. § 1983 provides a cause of action for damages against any person acting under color of law who deprives another person of rights guaranteed by the Constitution or laws of the United States.

180.   Defendants acted under color of law by retaliating against Plaintiffs, including denying Jane the identical remote access accommodation

provided to other students in the District, due to the Does' advocacy for Jane, their communication with the RSU 21 school board, and Ms. Doe's newspaper column about the reduction in band instruction.

181.   Retaliating by penalizing Jane and her family through the denial of Jane's remote access amounts to a violation of Plaintiffs' First Amendment right to free speech and right to petition for redress of grievances.

182.   As a proximate result of Defendants' retaliatory actions, Plaintiffs have suffered damages, including emotional distress, Jane's loss of educational services, and Jane's worsening mental health symptoms.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor against Defendants and award them:

    a.   Preliminary and permanent injunctive relief permitting Jane remote access to her classrooms through a telepresence robot, such as the District has allowed to other students in RSU 21, for purposes of acclimatizing herself to those classrooms;

    b.   An award of compensatory damages and punitive damages in amounts that are reasonable in the premises;

    c.   Reimbursement of reasonable costs and attorney's fees under 42 U.S.C. § 1988, the Rehabilitation Act, and the ADA; and

    d.   Such other relief as the court may deem just and proper.

Dated:  December 28, 2023                Respectfully submitted,

/s/ Richard L. O'Meara
Richard L. O'Meara
*E-mail:*  romeara@mpmlaw.com

/s/ Francis D. Bigelow
Francis D. Bigelow
*E-mail:*  bbigelow@mpmlaw.com

/s/ Ellen Masalsky
Ellen P. Masalsky
*E-mail:*  emasalsky@mpmlaw.com

MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME  04104-5085
(207) 773-5651

Counsel for Plaintiffs