UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MR. AND MS. DOE, | ) | |
| both individually and on behalf of | ) | |
| their minor daughter, JANE DOE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:23-cv-00466-JAW |
| | ) | |
| REGIONAL SCHOOL UNIT 21, | ) | |
| DR. TERRI COOPER, and | ) | |
| ANITA BERNHARDT, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION TO DISMISS AND
MOTION FOR PRELIMINARY INJUNCTION**

Parents move the Court to preliminarily enjoin the school district their

daughter attends to grant her a telepresence robot as an accommodation so that she

can remotely access her classes and better acclimatize to the school environment

given her anxiety disorder. The parents contend that the school district's denial of

this accommodation is intentional discrimination on the basis of disability in

contravention of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and

Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 *et seq.*, and

is retaliation for the parents' criticisms of the district in violation of their First

Amendment rights to free speech and petition. Meanwhile, the superintendent and

assistant superintendent of the school district move to dismiss the retaliation claim

against them, contending that the parents have failed to plausibly allege they acted

with retaliatory animus. The Court dismisses both motions.

## I.   PROCEDURAL HISTORY

On December 28, 2023, Mr. and Ms. Doe, both individually and on behalf of their minor daughter Jane Doe, filed a complaint against Regional School Unit 21 (RSU 21 or District), Dr. Terri Cooper, the District Superintendent, and Anita Bernhardt, the Assistant Superintendent, *Compl.* (ECF No. 1), asserting claims under § 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act, and the First Amendment to the United States Constitution. *Id.* ¶¶ 167-82.  That same day, Mr. and Ms. Doe filed a motion for preliminary injunction. *Mot. for Prelim. Inj.* (ECF No. 5) (*Pls.' Mot.*).  On January 26, 2024, RSU 21 answered the Complaint, *Answer* (ECF No. 21) and opposed the Does' motion.  *Resp.* (ECF No. 23) (*Defs.' Opp'n*).  On February 2, 2024, the Does replied to RSU 21's opposition to their motion for preliminary injunction. *Reply* (ECF No. 24).

Also on January 26, 2024, Dr. Cooper and Ms. Bernhardt filed a motion to dismiss for failure to state a claim. *Mot. to Dismiss for Failure to State a Claim* (ECF No. 22) (*Defs.' Mot.*).  On February 16, 2024, the Does opposed Dr. Cooper and Ms. Bernhardt's motion to dismiss, *Resp. in Opp'n* (ECF No. 26) (*Pls.' Opp'n*), and on March 1, 2024, Dr. Cooper and Ms. Bernhardt  replied.  *Reply Mem. of Law in Supp. of Mot. of Defs. Terri Cooper and Anita Bernhardt to Dismiss* (ECF No. 27) (*Defs.' Reply*).

## II.   FACTUAL BACKGROUND

### A.   The Preliminary Injunction Record

The Does attached to their motion for preliminary injunction a sworn declaration of Ms. Doe, essentially tracking the factual allegations in the Complaint.

*Pls.' Mot.*, Attach. 1, *Decl. of Ms. Doe in Support of Pls.' Mot. for Prelim. Inj.* (*Ms. Doe Decl.*).  To their opposition to the motion for preliminary injunction, the Defendants attached three sworn declarations: (1) Marty Bouchard, Principal of the Middle School of the Kennebunks (MSK), (2) Rachel Bratter, Director of Special Services for the District, and (3) Gregory Hesse-Stromberg, a Licensed Clinical Social Worker employed by the District.  *Defs.' Opp'n*, Attach. 1, *Decl. of Marty Bouchard in Support of Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.* (*Bouchard Decl.*); Attach. 2, *Decl. of Rachel Bratter in Support of Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.* (*Bratter Decl.*); Attach. 3, *Decl. of Gregory Hesse-Stromberg in Support of Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.* (*Hesse-Stromberg Decl.*).  The Plaintiffs attached to their reply a second sworn declaration of Ms. Doe.  *Reply*, Attach. 1, *Reply Decl. of Ms. Doe in Support of Pls.' Mot. for Prelim. Inj.* (*Ms. Doe Reply Decl.*).  In considering the motion for preliminary injunction, the Court has relied on the contents of these sworn declarations.  In addition, for some undisputed facts that do not appear in the sworn declarations, the Court has included factual allegations in the Complaint that the District admitted in its Answer.

### B.   Ms. Doe's Sworn Declaration

#### 1.   The Does

Mr. and Ms. Doe and their minor daughter, Jane Doe, moved from Somerville, Massachusetts to Kennebunk, Maine in September 2021, as Jane was starting fourth

grade. *Ms. Doe Decl.* ¶ 7. They remain residents of Kennebunk, Maine, where Jane is currently[1] an eleven-year-old student enrolled in sixth grade at MSK. *Id.* ¶¶ 1, 2.

For her entire life, Jane has exhibited social anxiety, which has especially hindered her in new situations, such as meeting new people and trying new things. *Id.* ¶ 3. In 2021, Jane's pediatrician diagnosed her with social anxiety disorder (social phobia). *Id.* ¶ 4. Thanks to efforts by her parents to prepare and guide her through new situations, along with encouragement from friends, Jane was able to manage her social anxiety through elementary school, *id.* ¶ 5, including participating in softball, one of her passions. *Id.* ¶ 6.

### 2.     The Does and the Sea Road School

In 2021, at the start of fourth grade, the Does enrolled Jane at Sea Road School in Kennebunk (Sea Road). *Id.* ¶ 8. Regional School Unit 21 is the local education agency responsible for providing a public education to age-eligible residents of Arundel, Kennebunk, and Kennebunkport, Maine. *Compl.* ¶ 2; *Answer* ¶ 2. Dr. Terri Cooper is the Superintendent of RSU 21, and Anita Bernhardt, the Assistant Superintendent. *Compl.* ¶ 3; *Answer* ¶ 3.

Jane's parents notified the District of her social anxiety diagnosis. *Compl.* ¶ 12; *Answer* ¶ 12. Jane's parents prepared her for fourth grade by arranging a private tour of Sea Road before the first day of school. *Ms. Doe Decl.* ¶ 9. During the tour, Jane met the principal, Cory Steere, who offered to assign a teacher who would work well with Jane given her anxiety disorder. *Id.* The Does believe that largely due to

---

[1] The Court recites the facts as they existed when the filings were made. The parties have not amended the record to reflect any changes since then.

this advanced preparation, Jane loved going to school and thrived at Sea Road during fourth and fifth grade, making many friends and enjoying her interactions with her teachers. *Id.* ¶ 10.

### 3. The District's Curriculum Change and the Does' Reaction

During the summer of 2023, Ms. Doe learned that RSU 21 planned to move the time slot for elementary school band to recess or morning meeting, thereby cutting band instruction from 45 to 30 minutes. *Id.* ¶ 11. RSU 21 claimed that this reduction would "protect core classes" without compromising "instructional time." *Id.*

Mr. Doe grew up playing in band, and in school Ms. Doe also had a major interest in the arts. *Id.* ¶ 12. Ms. Doe felt strongly that the District was making a mistake by cutting band time and moving band instruction to the only unstructured time that students would otherwise have. *Id.* Ms. Doe learned that some other parents, teachers, and staff in the district felt the same way about the proposed cuts to band. *Id.* ¶ 13.

On August 8, 2023, the Portland Press Herald published an opinion column written by Ms. Doe, in which she argued against the band cuts. *Id.* ¶ 14. She urged her fellow citizens to "hold the administration and [school] board accountable." *Id.* A modified version of the Press Herald piece appeared in the Kennebunk Post on September 6, 2023. *Id.* In her column, Ms. Doe encouraged students and former students to protest the proposed band time cut:

> Maybe kids will be heard. TikTok kids get stuff done. Write letters. Get involved. Students and former students who want to say something about education and the immeasurable impact arts have on them – get your bucket. Say it now, as loud and confidently as you can.

5

*Id.* ¶ 15.

In addition to her newspaper column, Ms. Doe sent five emails to the school board about the band issue but received no responses that addressed her concerns. *Id.* ¶ 16.  In July and August 2023, Ms. Doe attended two school board meetings to request a response, but neither the school board nor the superintendent answered her concerns.  *Id.* ¶ 17.

### 4. The Does' First Experiences with the Middle School of the Kennebunks

In August 2023, Jane was preparing to begin sixth grade at a new school, MSK. *Id.* ¶ 18.  Aware of Jane's social anxiety, her parents sought to prepare her for MSK, as they had successfully done when she started at Sea Road.  *Id.* ¶ 19.

During the summer of 2023, MSK went through a period of disorganization. *Id.* ¶ 20.  MSK was unable to provide correct schedules to its incoming students.  *Id.* Twice in August, MSK's principal emailed parents to apologize for scheduling glitches and explained that the school was training new staff members in the scheduling department.  *Id.*  Because of this, when the first day of school arrived, Jane's parents had no idea what to expect.  *Id.* ¶ 21.  They did not know the identity of Jane's teachers, other than the name of her homeroom teacher, or where she should go.  *Id.*

Jane took the bus to and from MSK on the first day of school, August 28, 2023. *Id.* ¶ 22.  After returning home, her parents observed that she was uncharacteristically quiet and becoming increasingly anxious.  *Id.* ¶ 23.

The following morning, Jane exhibited anxiety about taking the bus to school, which Ms. Doe observed was preventing her from leaving the house.  *Id.* ¶ 24.  Ms.

6

Doe believed that if she could get Jane to school to see her best friend, a fellow student in Jane's homeroom, Jane would feel better and be able to get through the school day. *Id.* ¶ 25.  Ms. Doe proposed that Jane take the bus and promised to follow the bus in her car and meet Jane at the school.  *Id.* ¶ 26.  Jane reluctantly agreed and got on the bus.  *Id.*

Ms. Doe arrived at the school before Jane's bus, entered the building, and encountered a man at the front door she believed to be a teacher.  *Id.* ¶ 27.  Ms. Doe alerted him that a student coming off bus seven might be in distress.  *Id.*  In fact, Ms. Doe was speaking to the school's principal, Marty Bouchard.  *Id.* ¶ 28.  Ms. Doe also told the school resource officer and the assistant principal, Luke Myers, that Jane might come off bus seven, see her mother's car, and run to it, experiencing a panic attack, and they should allow her to do so.  *Id.* ¶ 29.  They promised to send Jane to her mother.  *Id.*

Jane emerged from the bus and started to walk into MSK but could not continue.  *Id.* ¶ 30.  She saw her mother's car, ran across the parking lot, and climbed into the backseat.  *Id.*  Ms. Doe brought her home to take a break.  *Id.* ¶ 31.  Jane went to her room and used colored pencils to write a handwritten letter to Principal Bouchard:

> Dear Mr. Bouchard
> I know Maine RSU21 stopped online learning but the online aspect realy helped me. I'm am one of a handful of kids who realy struggle in a school envirment, espesaly with new trasitions. Wether being bullied – or having painic atacks, I think a hybrid learning idea would **help.**

I understand it might be hard to juggle, with band – and little teachers but when hybrid stopped, some students were cut off. And also I personally feel alot safer at home.

Please consider this
Your student [JANE]

*Id.* ¶ 32 (spelling and emphasis in original). Jane shared the letter with her parents, who were proud of her for advocating for herself. *Id.* ¶ 33. They knew, however, that she was expected at school and that there were rules about attendance. *Id.*

Ms. Doe tried to bring Jane to school at 9:00 a.m. *Id.* ¶ 34. When they arrived at the school, they entered the building together and Jane collapsed to the floor in the school lobby. *Id.* She was frozen in place, shaking, and could not move. *Id.*

Brian Grant, a guidance counselor at MSK, was in the lobby that morning. *Id.* ¶ 35. Working together, he and Ms. Doe were able to get Jane up to his room after about 20-30 minutes. *Id.* Mr. Grant and Ms. Doe tried multiple times over the next two-and-a-half hours to get Jane to go to class. *Id.* ¶ 36. Each time, however, she would collapse to the floor, unable to leave Mr. Grant's room. *Id.*

Ms. Doe remembered Jane's note to Principal Bouchard. *Id.* ¶ 37. She asked Mr. Grant to invite the principal up so Jane could deliver the note to him personally. *Id.* Mr. Grant declined but promised to deliver the note. *Id.* Finally, around midday, Ms. Doe drove Jane home. *Id.* ¶ 38. Jane's parents had never seen Jane exhibit such severe anxiety symptoms. *Id.*

The next day, August 30, 2023, Ms. Doe brought Jane to school and attempted to help her enter the building, but Jane began to have a panic attack and could not enter the school. *Id.* ¶ 39. Ms. Doe ended up bringing her home. *Id.* Upon arriving

8

home, Ms. Doe emailed Mr. Grant, Principal Bouchard, and Jane's homeroom and social studies teacher, Thomas Taylor, copying Mr. Doe (collectively Team Jane or 504 Team):

> [Jane]'s anxiety is such that she says she wants to be in school but can't get in the door because she's too overwhelmed, hence the panic attacks yesterday, and the one we headed off this morning.  I knew it wasn't going to work as soon as her best friend came over and tried to get her to go, and [Jane] was unresponsive.  A reinforcer is only a reinforcer (which [Jane's best friend] usually is!) if someone is under a threshold of stress to be able to find it reinforcing.
>
> She couldn't even take a single step with her bestie.  I knew at that point she was up against a wall and anything else to push her was going to result in us watching her repetitively fall off a cliff, like yesterday.

*Id.* ¶ 40.  Ms. Doe's email also said that Jane would be seeing her pediatrician to explore the possibility of short-term anxiety medication.  *Id.* ¶ 41.

Mr. Doe emailed Team Jane to notify them that Jane would be seeing her pediatrician that very day and would not be in school.  *Id.* ¶ 42.  That evening, Mr. Doe emailed Team Jane again to request a 504 Team meeting for her as soon as possible:

> After discussing with [Jane]'s doctor today, the immediate plan is to attend for the end of the day Thursday (Social Studies/ homeroom). I will sign [Jane] in and bring her to class at 12:45 so that she can arrive before the other students. We will assess how this works and determine the plan for after Labor Day accordingly.
>
> We also need to meet and establish a 504 plan and any other support as soon as possible. [Jane] has expressed some level of comfort with Mr Taylor so it would be great if he can participate in the 504 plan discussion. I have attached a letter from [Jane]'s doctor that recommends this course of action as well as excusing [Jane]'s absence today. Please let me know when we can meet.

>We are working on getting some outside help for Jane as her anxiety has elevated beyond previously manageable levels. If there is therapy/counseling available through the school we can discuss that as well.

*Id.* ¶ 43.

Heading into September, Jane's anxiety was preventing her from attending school for the entire day. *Id.* ¶ 44. The Does only brought her to school for last period Social Studies with Mr. Taylor on Thursday, August 31st, and every day after the Labor Day Weekend starting Tuesday, September 5th. *Id.* Jane had some success with these brief appearances for her social studies class. *Id.* ¶ 45. She also attended a few other end-of-day classes, such as art and chorus. *Id.* Her parents' strategy was to acclimate her to school with these isolated classes, with the goal of slowly moving her back to full school days. *Id.* ¶ 46.

### 5.   The Section 504 Referral, Meeting, and Accommodations

On September 13, 2023, Mr. Grant made a referral for Jane under Section 504 of the Rehabilitation Act, *id.* ¶ 47, which provides eligible students with disability-related accommodations. On the referral form, under question 2a ("Briefly describe the areas of concern for this student"), Mr. Grant wrote: "Anxiety preventing regular school attendance." *Id.* ¶ 48.

The following day, September 14, 2023, Jane and her parents attended a 504 Plan meeting with Team Jane. *Id.* ¶ 49. Ms. Doe shared with the 504 Team that Jane had experienced panic attacks in response to anticipating or attending school. *Id.* The Does provided the team with a letter from Jane's pediatrician, Dr. Michelle Lock, which provided Jane's anxiety disorder diagnosis. *Id.* ¶ 50. Mr. Grant's

10

minutes from the September 14 meeting document that Dr. Lock's letter fulfilled the need for documentation and that Jane's anxiety rendered her eligible for a 504 Plan of accommodations:

> [Jane]'s communicating, learning, concentrating, thinking, breathing and interacting with others are being impacted by her anxiety. Except for breathing, the remaining have a substantial or severe impact. Due to [Jane] being substantially or severely impacted by her anxiety, it was determined that she is eligible for a 504 with an accompanying plan including accommodations.

*Id.* ¶ 51.

The District offered Jane three accommodations: providing her with work when absent, allowing her access to designated people and spaces as needed, and allowing her to draw or doodle during class. *Id.* ¶ 52.

### 6. Jane's Continued Struggles Entering the Middle School of the Kennebunks

On September 15, 2023, Ms. Doe brought Jane to school in the morning, but Jane sat in the car, too anxious to enter the school building. *Id.* ¶ 53. Ms. Doe emailed Team Jane from the parking lot: "We're outside and[] she can't go forward. I'm at a loss." *Id.* Mr. Grant and Mr. Taylor each emailed back, expressing their sympathy for Jane. *Id.* ¶ 54. Ms. Doe responded:

> It's not the schedule- it's the anxiety now. I fear nothing we do without medical support will be effective.
>
> She's so sensitized now to even the alarm predicting she's going to school and having stomach aches before we even leave that the anxiety process is in motion long before we even get to the school.
>
> And once she's there, she gets stuck. I'll call her pediatrician today and see what we can do. This is, I suspect, in the medical realm now.

*Id.*

11

Jane's parents brought her to Boston to see her pediatrician that day. *Id.* ¶ 55. Later that afternoon, Ms. Doe emailed Team Jane and reiterated Jane's request for online learning to transition her back to the classroom:

> [We] are driving back from Boston after seeing [Jane]'s pediatrician. We are going to try anti-anxiety medication to see if we can increase her stress threshold. We'll keep y'all posted on Monday as soon as we know what's going on.
>
> If there is ever an option to have a laptop with zoom on it in her chair in some of these classes to help her intro in and slide in hybrid style for a couple weeks, we're up for it as a transitional tool.

*Id.*

On September 18, 2023, Jane tried to enter the school building, but her anxiety prevented her from doing so once again. *Id.* ¶ 56. That morning Ms. Doe emailed Mr. Taylor (Jane's homeroom teacher) and Mr. Grant:

> Even with drugs on board, we had a mild attack but still struggling. She hid in the backseat when Brian came over to the car to check in. Took about 10 minutes to come out from the floor . . .
>
> We've been out in this parking lot for over an hour—she's able to communicate a little more than last week- "my stomach hurts. I really want to go in but I can't just yet. My body and brain won't let me. I want to go to Spanish. I can't get there."
>
> She is trying so hard to the point she's making herself physically sick.

*Id.* ¶ 57. In that same email, Ms. Doe renewed her request that the school allow Jane to integrate into the classroom virtually:

> I know it was off the table three weeks ago but I'm now going to formally request consideration for virtual integration in classes so she can acclimate to class structure as a stepping stone. I think we should try this as we continue exploring options (and wait for the 4-6 weeks for the SSRI meds to kick in).

12

> I know so many kids flailed with virtual, but for kids like her who thrived, it can be a lifeline. Our kids who are bullied, kids with their first period, kids who have a bit of a cold but are able to learn—lots of reasons to have this as an option as a spot treatment for integration or just not missing school when they can do school but not the people-y part.

*Id.* ¶ 58.

Ms. Doe clarified that she was not looking for separate lesson plans for Jane nor a permanent virtual option.  *Id.* ¶ 59.  Jane needed a short period of virtual learning to ease her back into the classroom in person:

> She won't need additional classroom support, or a different lesson. She can attend classes, see on the inside How it goes, and integrate as the meds kick in. She can then get a feel for the daily schedule, then slide in as the meds start working - and she can stop feeling like she's being left behind.
>
> As a teacher, I hated coming up with lesson plans suited for online learning because it is different. but given this isn't a long time solution or option, and potentially part of a behavior plan, that's not going to be necessary. It's a tool we can hopefully use so she can see what it's like and slowly integrate.
>
> While sitting in the parking lot is a good desensitization plan, she's still missing out on everything else that she can [do] and is capable of doing.

*Id.*  Ms. Doe stressed that, although they had tried several things to help Jane, they had yet to try what Jane herself had suggested in writing at the beginning of the school year, which was virtual learning:

> I'm hopeful we can at least consider this option–we're throwing a lot of spaghetti at the wall to see what sticks, and yet we haven't done the thing she told all of us would help her on day one. I was reluctant to push for it because I thought she'd get in the building. It's never been this bad before. Looking back, she gave us the answer weeks ago with that letter to Mr. Bouchard.

*Id.* ¶ 60.

13

Principal Bouchard replied later that day:

Mr. Grant forwarded your email and your request for a virtual option for [Jane]. We are not currently offering virtual options for students in RSU 21. We are more than happy to discuss other modified options for [Jane] including partial days, altered scheduling, scheduling changes, etc. I am also appreciative of the nice note [Jane] wrote me, however, at this time I do not have the ability to offer virtual learning.

Hoping we can work together to find the best solution for [Jane]!

*Id.* ¶ 61.

Ms. Doe wrote back to elevate her request to the district level:

I guess I'm just frustrated because we are doing our best with partial days and we can't even get in—so get partial days are still a net zero. She needs smaller steps.

We are going into 4th week of school, and we'll be missing potential another 4-6 until the medications kick in. That puts her over two months behind. Y'all are doing everything you can, we're doing everything, and this seems like a much simpler, temporary fix for most parties without putting her further behind the 8 ball.

I guess I sound like I'm begging because I am. When I thought back to her note after our meeting, it was the first time I realized there was a glimmer of hope for her to integrate more smoothly in tandem with the meds. . . . I'm hoping for flexibility on this because I know this can work and she won't have to keep suffering and falling behind as we build up to full integration.

It's so hard as a parent to watch her fall off a cliff every day for school—something she loves, and we have to keep making her go through this—crumpled in the back seat, making herself sick—aside from a horse tranquilizer I'm at a loss. Our lives are fully on hold and this has been stressful for everyone on her team and in her home. Her world is so small right now and we are desperate.

We all used this kind of tech for a year (She did for 2). It's almost more frustrating knowing there is a tool that can help her that connects the world every day- and that the accessibility tool that would be most

beneficial to her, by her own words, is inaccessible in the place it would
help her the most. That makes me feel even more helpless as a parent.

If anything changes, please let me know—or if there is someone at the
district level that I can petition to, since it sounds like a district policy
and not an MSK policy. Which, I'm not mad at you for the policy. I'm
baffled and frustrated after Covid the tool everyone used is just gone as
if it never happened. The door to access her learning is closed, and that
is a harder pill to swallow than the ones she's taking to try to get in the
classroom.

*Id.* ¶ 62.  Principal Bouchard responded the following day:

Thank you for being so communicative and I am SO very sorry we are
not able to offer a virtual option. This is the same across all of the RSU
21 schools right now. We will continue to be steadfast in our efforts to
support [Jane] and your family!

*Id.* ¶ 63.

Ms. Doe persisted, asking Principal Bouchard again about whom she could

approach at the district level to get Jane this accommodation, which she likened to a

wheelchair ramp for full access to the school building:

Thanks, Marty—and I totally appreciate that's not something that is not
presently offered. The way I'm looking at it is she needs it. So, who do I
need to speak with to change this policy or find a way to make it
available to her so she can be an active participant in school? This tool
is not unlike a wheelchair ramp to have full access to her learning.
School board meetings are all online and offer virtual participation. The
tech exists. She has a computer—one the district gave to her. She needs
access to that technology. Some classrooms in other buildings are
allowed air conditioners for kids who have particular needs in their
learning environment even though they are not allowed in every room.
This is no different. Who do I speak with to get her this accessibility tool
or change the policy so kids like her don't get left behind?

If this is an ADA thing (which it's starting to feel like to me), point me
in the right direction. If this is an administrative thing, point me in the
right direction. I'm not asking you to change the rules for her—I'm
asking you point me in the direction of who can so I can get her what
she needs to have full access to her learning, something she desperately

15

wants, and something she needs. There are only some many times in a day she can do math facts - and trust me, she's doing them, but we can all agree she needs more.

And this isn't an angry letter—not coming at you—I know you and everyone on this list are in full support of us and our kid, and all of you would do the same for yours, especially when it's something that is - on the outset, right there within reach. The last thing we need is in 6 weeks for her to finally have the confidence to get in the classrooms only to be set back by not knowing her teachers, her classmates, the school day structure or the baseline information to advance her skills.

Just please, tell me where to go and I'll take it from there.

*Id.* ¶ 64.

On September 21, 2023, Principal Bouchard responded that Ms. Doe should

approach Dr. Terri Cooper, the District's superintendent:

Very sorry for the late reply. I am very hopeful the medication works and we can quickly have [Jane] be able to attend MSK.

As far as the decision around no virtual classes at this time, it is a district decision. My boss is the superintendent of schools, Dr. Terri Cooper. I have let her know about your request already. Please keep us posted on progress and when you believe [Jane] may be ready to move forward with trying some of our classes in a modified format.

*Id.* ¶ 65. Ms. Doe thanked Principal Bouchard and updated him that Jane had tried

again to get into the classrooms that day but "froze in the hallway." *Id.* ¶ 66.

### 7.   The Does' Requests to Other District and MSK Staff

Mr. Doe emailed Superintendent Cooper that same afternoon of September 21,

2023:

Dear Dr. Cooper,

My daughter, [Jane Doe], is a 6th grader at Middle School of the Kennebunks. Transitioning to 6th grade has been beyond challenging for her. Her pediatrician has previously diagnosed her with anxiety, but while school and other life transitions have been difficult in the past she

16

has been able to succeed with the support of some wonderful members of the Sea Road School community (Cory Steere, Elizabeth Thompson, Emily Phillips).

This year her anxiety has worsened—she has attended less than two days of school in total this year—and her pediatrician recommended that we discuss a 504 plan with the middle school. We met with staff at MSK (Brian Grant, Marty Bouchard) and determined [Jane]'s eligibility for 504 plan accommodations. The staff and teachers have been very understanding and helpful (Tom Taylor and the entire Cadillac team have been great!) to the extent that they are able (e.g., modifying [Jane]'s schedule, allowing us to escort her into the school, providing flexibility to sign out of class and go to a "safe space" when needed), but they have been limited by district policy in providing accommodations that could be truly helpful for [Jane]. So far, even with the 504 plan in place, [Jane]'s disability has prevented her from attending school.

[Jane] herself at the beginning of the year advocated for what she thought would be most helpful and wrote a letter to Principal Bouchard requesting some form of online learning to assist in her transition. Unlike some children who struggled with online school during Covid-19, [Jane] found it a helpful means to manage her anxiety.  It allowed her to gradually build comfort with teachers and classmates without being thrown into the deep end to sink or swim, and allowed her to keep learning and progressing.  "Learning loss" may be a valid concern in the aggregate, but [Jane] continued to exceed grade level averages on standardized testing both during and after the pandemic.  All kids are different.

We are doing everything we can as parents to help our daughter.  She has begun medication under the supervision of her pediatrician, but it takes time to find the right medication and dosage.  She is in therapy to try to work through her challenges and develop coping mechanisms, but this is also a process that takes time.  We are doing our best to stay in touch with her teachers and keep her engaged with her learning from home in preparation for the time when she can get in the school building. It is not enough.  [Jane] needs help building comfort and trust with her teachers and the school environment, and her condition doesn't allow her to do that from inside the building currently.

We have been told that district policy does not allow for virtual learning.  While I can understand this as a general policy, we are asking for consideration with respect to disability accommodation.  We are NOT looking for a full virtual school option, separate curriculum, or anything of that nature.  We are simply asking for a livestream of some sort to

enable [Jane] to stay engaged with school, limit her falling behind, and most importantly allow her to build confidence so that she can transition to attending school IN PERSON.

I understand that it can be difficult to balance the needs of the school district writ large with the needs of individual students, but I know that you value equity and inclusion, and I believe that you want all students to succeed.  I am hoping that it is in this spirit that you will consider our request to allow MSK to make additional accommodations for [Jane] as needed, even if they are in conflict with district policy.  [Jane]'s anxiety may not allow her to express it, but she would be extremely grateful for your help.

Sincerely,
[Mr. Doe]

*Id.* ¶ 67.  Neither Superintendent Cooper nor anyone on her staff responded to Mr. Doe's written request for accommodation.  *Id.* ¶ 68.

The same day, September 21, 2023, the Kennebunk Post published a letter to the editor from Erin Nadeau, a member of the RSU 21 School Board, addressing Ms. Doe's September 6th column about RSU 21's band reduction.  *Id.* ¶ 69.  Ms. Nadeau accused Ms. Doe of spreading "misinformation" and insinuated that Ms. Doe had accused the board of "setting kids up to fail."  *Id.* ¶ 70.

After four days with no answer from the superintendent, on September 25, 2023, Ms. Doe emailed MSK's Special Education Director, Rachel Bratter, and Assistant Director of Special Services, William Putnam:

Hello Ms. Bratter, Mr. Putnam and school staff,

As we head into the 18th day of missed instruction for my daughter, [Jane Doe], we are increasingly concerned about her access to the general education curriculum and to instruction from a certified educator to work towards grade level standards.  Due to her diagnosis of Social Phobia and Separation Anxiety (provided to her 504 team—Brian Grant, Marty Bouchard and Tom Taylor on September 14) she

18

was given a 504 in order to assist her with accommodations to access the classroom. Despite our rigorous efforts as her parents to support her learning at home, including taking FMLA, daily attempts to integrate her into the building, and guiding her through Google Classroom assignments, she continues to be unable to access instruction from a general education teacher or the learning environment.

When the team met to review eligibility for a 504 plan on September 14, 2023, it was determined that [Jane] qualified and would benefit from a system of support. Based on this, the team developed accommodations in many areas that impacted [Jane]'s ability to be in the classroom, and we agreed upon a specific set of accommodations to help support her. ***We have yet to receive a copy of the official 504 plan or the minutes from the 504 meeting and are requesting these documents immediately so we can move forward with a suitable plan for [Jane] to access instructional time.*** Despite the outlined accommodations being attempted, and upon a request for further accommodations and support to help [Jane] access the building, we were informed that in order for [Jane] to access the ADA accommodations, she would have to enter the building. Our understanding from this response is that [Jane] is only permitted to her education and supports towards that education once she enters the building, despite her disability precluding this remedy. Unfortunately, as [Jane] is a student in a public school with a 504 plan, this is not an option and RSU 21 continues to be responsible to educate [Jane] in all areas of general education.

Our request for virtual access to her classrooms while she integrates into the building has been denied by the 504 team due to district policy prohibiting virtual access to classrooms, which we as her parents find unreasonable. We were instructed to reach out to the Superintendent of RSU 21 to request virtual access, as it is our understanding district policy falls under her purview.

As we have not had reciprocal communication regarding our request (email on 9/21/23 to Superintendent, Dr. Terri Cooper) for remote instruction, and have not been informed as to how our child will be accessing a Free Appropriate Public Education, we are reaching out to confirm the ChildFind obligations of RSU 21. We are seeking to ensure that our child is being adequately instructed and if there are suspicions of a disability that impedes her ability to access the curriculum and general education classroom, that an evaluation will be conducted in order to ascertain deficits and to define appropriate evidence-based interventions to support [Jane] in her learning journey.

> Therefore, we are requesting a referral to special education in the suspected area of disability of Other Health Impairment, due to [Jane]'s multiple diagnoses of anxiety as well as the academic and behavioral data from the beginning of the 2023/2024 school year. Since August 29, 2023, [Jane] has not received daily instruction, and most of her Google Classrooms to access supplementary materials were not given until at least two weeks after school had started; and, some Google Classroom materials are not yet available. At this point in the school year, she has received nearly all instruction from her parents, who are not certified teachers and she has had no instructional outreach from teachers to provide assessments or baseline curriculum measures that are standard practice in the beginning of each year. Without these measures or ones similar in nature, we are unable to determine where [Jane]'s current level of performance is in both academic and social-emotional areas. Moving forward, we will need to be informed of how RSU 21 will support [Jane] in accessing the classroom, who will be providing the instruction and what other 504 accommodations will be provided as her current 504 plan is insufficient.

> Our referral for special education is requested to be discussed in person as is our right, and we look forward to a meeting within 15 days.

*Id.* ¶ 71 (emphasis in original). Ms. Bratter responded that someone would be in touch with them soon about a special education referral. *Id.* ¶ 72.

Meanwhile, on September 25, Jane's parents had a phone call with Tara Skiff, a school psychologist who works for the District. *Id.* ¶ 73. During this conversation, the Does reiterated their request for remote learning for Jane. *Id.* Ms. Skiff then emailed the Does to say the District was no longer offering remote learning options, but they had the option of homeschooling Jane:

> As per our conversation I was able to get more information from administration regarding virtual learning. At this time, the State of Maine is no longer in a COVID emergency and no longer providing remote learning options in public school. The option becomes if you wish for this type of learning you would need to withdraw [Jane] and "homeschool" with the option of a virtual learning school.

*Id.* ¶ 74.  Ms. Doe responded to say that they had no desire to homeschool Jane and were looking for a plan to acclimate her to MSK's classrooms.  *Id.* ¶ 75.  Meanwhile, the Does were concerned about how to get Jane access to school:

> But, we continue to be concerned about how she will access instructional time, which is legally owed.
>
> I'm voicing the concern here as we have worked diligently for 5 weeks, including taking FMLA, meds will take up to 4-6 weeks to get in her system (assuming they are the right medication, which they very well might not be), and she is fully capable of learning at home as she transitions into the classroom. Each passing day is another day of instructional time that she is otherwise fully capable of participating in, if only she could access it.
>
> So while I understand now we are focusing on getting her into the classroom and building, down the road in December if she's still not in the building, what then?
>
> I agree [Jane] needs to build relationships, which we have a plan with [Special Education Director] Rachel [Bratter] for tomorrow, and we may take you up on this, too.  However, it's infuriating the one tool that everyone had access to, the one that would expedite this entire process, a tool that can stop her from suffering any longer, is out of reach for her to access her learning - learning that she wants.  Something everyone else uses, including the school board for their meetings, it's not available as a transitional tool for a kid[] in this district to access her education, 5 weeks into the school year.
>
> I'm just putting that in writing so it's started somewhere that I'm advocating for this, and that the district is continuing to deny access to that tool.  I also understand that many of [Jane]'s helpers (like you) have their hands tied by district policy, and that is so upsetting to me, too.

*Id.*  Ms. Skiff responded:

> I am happy to hear you have a meeting with Rachel today.  Please keep me updated on how I can help after the meeting.  I will also keep in touch with Rachel.  Our goal is for [Jane] to access her learning in school.  As I stated earlier, we need a specific plan in place to help [Jane] transition into the school building and I am hopeful as a team we can create that plan.

*Id.* ¶ 76.

On the night of September 25, Ms. Doe attended a school board meeting.  *Id.* ¶ 77.  She took the podium and responded at length to school board member Erin Nadeau's accusations that she had spread misinformation about the District's decision regarding band.  *Id.*  Ms. Doe corrected Ms. Nadeau on several points and then requested a public apology, which she never received.  *Id.*

On September 26, 2023, Jane and her parents attended an informal "meet and greet" with Special Education Director Bratter.  *Id.* ¶ 78.  While Jane's family toured the halls with Principal Bouchard and Rachel Bratter, another teacher who had observed Jane in distress remarked, "I feel so bad."  *Id.* ¶ 79.  Principal Bouchard replied, "How do you think *I* feel? She wrote me a letter and I couldn't do what she asked me to do to help her."  *Id.* (emphasis in original).  Jane's parents learned that Principal Bouchard had saved Jane's handwritten letter and kept it on his desk so he could see it each day.  *Id.* ¶ 80.

On September 27, 2023, Assistant Superintendent Anita Bernhardt emailed Mr. Doe to deny his request for remote learning for Jane:

> Dr. Cooper shared with me your email expressing concerns for the participation of your daughter, [Jane], in middle school.  In your email you shared your appreciation for the efforts made by the staff at Middle School of the Kennebunks and made the request to have [Jane] access virtually, at least some of her instruction at Middle School of the Kennebunks.  In 2021, RSU 21 made the decision to return to in person learning for our students.  When weighing the experiences for students in the classroom, students at home and teaching staff, we determined this decision is the right choice for our district.  We continue to stand by that decision.

I realize that this is not the message you were hoping to receive. We will continue to partner with you and your family through the 504 process to find strategies that can support [Jane]'s successful participation in Grade 6.

*Id.* ¶ 81.

### 8.    Jane Doe's Developments

On September 29, 2023, Jane's therapist, Karen Matthews of Wayfinder Wellness and Psychotherapy Services, wrote a letter stating Jane's diagnoses: Separation Anxiety Disorder (F93.0) and Social Anxiety Disorder (F40.10) with differential diagnosis of Panic Disorder. *Id.* ¶ 82. These new diagnoses had emerged in Fall 2023 as Jane struggled with school attendance. *Id.* Jane's parents initially shared these diagnoses with Team Jane on September 14, but also shared a copy of Ms. Matthews' letter with the District. *Id.* ¶ 83.

On September 30, 2023, Jane had a softball game. *Id.* ¶ 84. She loved softball and had played for many years with great enjoyment. *Id.* It was her favorite sport, and her parents considered it her "happy place." *Id.* Historically, even if Jane was experiencing anxiety in other areas of her life, she could always play softball without hesitation. *Id.* ¶ 85. During the September 30 game, however, Jane became so overwhelmed with panic that she could not take the field. *Id.* She sat, unable to move, until the final inning of the game, when she finally managed to participate. *Id.*

### 9.    The Does' Requests for a Telepresence Robot

In late September of 2023, Jane's parents viewed social media posts from another family, which contained photographs of a child using a telepresence robot that allowed the child to remotely control the robot's movements inside the school building and use it to view his classroom, attend classes, and interact with classmates

and teachers through a video screen.  *Id.* ¶ 86.  Jane's parents learned that the child was using the robot at Kennebunk Elementary School, which is in RSU 21.  *Id.* ¶ 87. Ms. Doe spoke to teachers at Kennebunk Elementary, who told her they had seen the robot being used in the school.  *Id.*

On October 2, 2023, Jane and her parents were scheduled to meet with Special Education Director Rachel Bratter.  *Id.* ¶ 88.  Before the meeting, Ms. Doe went to Principal Bouchard's office to speak with him.  *Id.*  Ms. Doe asked Principal Bouchard if he would be willing to follow the suggestion of Jane's former principal about setting her up with a Zoom link in the MSK building so privacy concerns would not be an issue.  *Id.* ¶ 89.  She told Principal Bouchard that Principal Steere had suggested that Jane could even set up this link in his building (the elementary school) and two of Jane's former teachers indicated that they could make her a "cozy nook" in their classrooms if it would help Jane get a Zoom link.  *Id.* ¶ 90.  Principal Bouchard became uncomfortable and told Ms. Doe that he would get fired if he agreed to any such measures.  *Id.* ¶ 91.  Principal Bouchard also told Ms. Doe that she would be putting Jane's teachers in a "bad position" if she were to ask them independently to allow a Zoom link in their classes.  *Id.*

At their scheduled meeting, Ms. Bratter told Jane's parents that Jane had no need for a special education evaluation:

> So the special education referral piece—you've made it clear that the academics is not concerned, that her actual being able to do the academics isn't a concern.  So as far as the special education piece is concerned, there isn't anything to do evaluations on.  We already know that she can physically do the work and we already know that she has a medical diagnosis, so special education would not be the appropriate

> direction to go in.  Her 504 is appropriate based on what her medical
> diagnosis is and things like that.

*Id.* ¶ 92.  Ms. Bratter also stated that the Does needed to contact Dr. Cooper with

their requests: "[y]ou would have to go to the superintendent specifically for remote

access to school.  That's a district decision I can't override."  *Id.* ¶ 93.

Mr. Doe interjected that the District was in fact allowing remote learning for

other students:

> We know for a fact that this district does allow that accommodation for
> some students.  We know for a fact that other districts accommodate
> students, other districts do it.  So it seems like it's reasonable based on
> that standard. I need to understand why it's not a reasonable
> accommodation.

*Id.* ¶ 94.  Ms. Bratter insisted that the District was not giving any student remote

access to a classroom, nor would it be willing to do so.  *Id.* ¶ 95.  The teachers' union

was powerful, she explained, and it had prohibited any type of recording devices from

being in District classrooms.  *Id.*  "The district is a nonremote district," Ms. Bratter

emphasized.  *Id.*

Ms. Doe asked how that could be true when (1) there were numerous

photographs of telepresence robots, including at Kennebunk Elementary School, and

(2) teachers at Kennebunk Elementary were telling her that they had seen the robot

in a shared hallway in the school.  *Id.* ¶ 96.  Ms. Bratter responded: "I don't know

what they're talking about. But I'm in KES all day long. I can ask about it."  *Id.*  When

Jane's parents pressed her further, Ms. Bratter told them to bring the issue before

the school board:

> I can feel your frustration. I can feel her frustration. I absolutely
> understand that. I do not have the authority to override the school
> board. You've been to a school board meeting. There's a lot more of them
> than there are with me. Whatever you are able to accomplish through
> Dr. Cooper and Anita and the school board.

*Id.* ¶ 97.

The RSU 21 School Board Policy and Procedures specify that complaints should be "addressed as close to the problem as possible." *Id.* ¶ 98. For example, Rule KE states that problems involving "special areas such as special education, transportation, food service, etc. should be called to the attention of the administrator who has responsibility for that program." *Id.* Rule KE continues that "if the complainant is not satisfied with the disposition of the complaint, the complainant may appeal to a higher level" and that "[i]f the issue has not been satisfactorily addressed the complainant may submit a written statement of complaint to the Superintendent." *Id.* ¶ 99. The District's rule states: "The Superintendent of Schools is generally the final source of appeal." *Id.* Finally, the rule provides: "Should dissatisfaction remain after the above steps have been taken,"—in other words, if a complainant is still dissatisfied after a final appeal to the Superintendent—Rule KE requires the Superintendent and School Board Chair to review the issue and determine whether it should be placed on the school board agenda. *Id.* ¶ 100.

This remedy of going before the school board after exhausting appeals with the Superintendent is echoed elsewhere in the RSU 21 board policy and procedure regulations:

RSU 21 SCHOOL BOARD POLICY AND PROCEDURE SECTION B: BOARD GOVERNANCE AND OPERATIONS BEDH - PUBLIC PARTICIPATION AT SCHOOL BOARD MEETINGS

5. Any concerns about personnel matters and/or student matters should be directed to the Superintendent or another appropriate administrator outside of Board meetings so that they can be addressed through an alternative channel and in a manner consistent with privacy, confidentiality, and due process rights of the individuals involved.

RSU 21 SCHOOL BOARD POLICY AND PROCEDURE SECTION B: BOARD GOVERNANCE AND OPERATIONS BDD - BOARD-SUPERINTENDENT RELATIONSHIP

The Board, collectively and as individual members, shall:

E. Refer complaints, criticisms, and requests to the Superintendent or other appropriate personnel and discuss them at Board meetings only after administrative solutions have been exhausted.

*Id.* ¶ 101.

On October 5, 2023, Superintendent Cooper attended a public forum about issues relating to public education, moderated by Maine Senator Joe Rafferty (Senate District 34), the Senate chair of the Joint Standing Committee on Education and Cultural Affairs. *Id.* ¶ 102. Mr. Doe also attended the forum. *Id.* ¶ 103.

Dr. Cooper had not yet responded to Mr. Doe's email from two weeks earlier.

*Id.* During the Q&A period, Mr. Doe addressed Dr. Cooper directly:

I'm actually concerned about students' mental health issues . . . it seems like there's still a lot of barriers to students getting supports and accommodations that they need to be successful in school. We're currently in the sixth week of our school year starting. My one daughter is still unable to attend class because of her own issues. Despite having a 504 plan, she is continuing to be denied accommodations that would help her be in the classroom. These are accommodations that her therapist has advocated for. Accommodations that we have talked to other school districts about and they say yes, we would certainly do that for children that had the same issues as your daughter has in our school

27

district.  So six weeks, six weeks, my daughter's not in school. She's not getting a public—I am a supporter of public education—she's not getting access to her education.  So I would love to hear what Dr. Cooper has to say about that.

*Id.* ¶ 104.  Superintendent Cooper declined to answer, claiming she did not know the situation, but said she would be "more than happy" to connect with people at the school level about the issue.  *Id.* ¶ 105.

Mr. Doe said he had talked to "lots of people at the middle school" and they had all been quite helpful.  *Id.* ¶ 106.  "The impression I get," he said, "is that they are being told that they cannot do things from the district office."  *Id.*  Dr. Cooper replied: "Again, I don't know who you spoke to."  *Id.*  She gave Mr. Doe her email address so he could contact her.  *Id.*  Mr. Doe responded: "I *have* contacted you and you have not responded to me so that is why I'm here tonight."  *Id.* ¶ 107 (emphasis in original). The Superintendent promised to call Mr. Doe the following day, but she has never done so.  *Id.*

Unable to access her classes, Jane began to fall behind her classmates academically.  *Id.* ¶ 108.  Her mother emailed Team Jane on October 16, 2023:

[S]he got a homework assignment about C14.  What is C14?  That sounds like instructional time would have helped her answer the question . . . and division homework that we haven't done since the Clinton administration so we all got it wrong.  This kid is falling behind, the administration will not give us the single tool that will actually help her integrate into her class . . . .

*Id.*  That same day, Ms. Doe went to a school board meeting.  *Id.* ¶ 109.  During the public comment period, she was recognized to speak.  *Id.*  Before beginning, she passed out papers to the school board members:

> I just handed out sixth grade homework questions from Google
> Classroom. Access on a computer the district gives every kid. You have
> to show your work, but here's the kicker: you don't have access to a
> teacher, so you have zero instruction and can't figure out what any of
> this means. How do you do it? This is my kid's reality for the last two
> months in RSU 21. She has no access to her teachers in what is clearly
> an ADA violation in this district. I'm here to get her and kids like her
> hope today. "We must protect instructional time." That was the mantra
> used by the superintendent to support cutting band by 33% in July. Once
> band was cut and kids had to choose between recess and recorders,
> protecting instructional time seems less important. You see, we have
> kids in our district and I can only speak to mine but I know there are
> others—

*Id.*

At that point, school board member Erin Nadeau—the same person who had

disparaged Ms. Doe in the Kennebunk Post—interrupted: "Point of order. We don't

have specific comments about students." *Id.* ¶ 110. Ms. Doe replied: "This is a bigger

problem about ADA and noncommunication by the superintendent." *Id.* ¶ 111.

Another board member, Gayle Asmussen Spofford, addressed Ms. Doe: "I do

have one procedural question. You know there's a path to filing a complaint. Have

you taken the other steps? Because the board's supposed to be the last step." *Id.* Ms.

Doe replied: "We are so frustrated. And we have been trying to communicate with our

superintendent, who will not respond back. And we have been trying to go through

the DOE. And our kid is in crisis and we are here to get help." *Id.* ¶ 112. Ms. Spofford

said: "You should submit that to the board with a list of the people that you contacted

because we are the last gate to come through. And there's really nothing we can do.

Until we have those pieces in place." *Id.* ¶ 113. Ms. Doe answered:

> I believe we have been trying to go through the steps. We have contacted
> the DOE, we have contacted MPA or MPF whatever they're called. We
> have gone through a principal. We were trying to get help for a kid in

crisis. And 10 days ago our superintendent said she would call my
husband and has not.

*Id.* ¶ 114.

At that point Erin Nadeau interrupted again, saying:

I think this conversation needs to come offline and, and, as Gayle noted,
we do need to have the steps that you've taken so that we understand
what the process is to date. And again, is not to shut down your
conversation but this is a confidential matter.

*Id.* ¶ 115.  Ms. Doe replied:

Can you guys at least understand why I'm standing here?  I have
reached out to the board and we have reached out to the superintendent
and nobody will write us back. I've been at this podium since July about
bands and nobody will write us back. Nobody will communicate back.
That's why I'm here today.

*Id.* ¶ 116.  Ms. Spofford then whisked Ms. Doe away from the podium, out of the room,

and into a hallway to discuss the matter.  *Id.* ¶ 117.

Later that night, on October 16, 2023, Ms. Doe emailed RSU 21's entire school

board about the incident:

I went tonight to plead for help for my kid, and the other kids like her
in the district (and there are others) who cannot get help or an email
response from our superintendent.  We have gone through our principal,
our 504 team, the special education department (who stated our kid
should not be in the special education program and would not benefit
from an IEP [Individualized Education Program]).  We have then
reached out to the superintendent and have never had a response from
her. We did, weirdly get one from [the] assistant superintendent who
was never copied on our initial email to Terri.  My husband asked her at
a public forum where she said, she didn't know about our case (which
was a lie— she had known about us for weeks), and finished with, "We'll
talk tomorrow" and it's been 10 days.

No response.

> Our kid has missed 8 weeks of school as of today and our superintendent cannot even be bothered to respond to an email or "talk tomorrow." And she's the one who can help. That is why I went tonight. I am begging for help, an accessibility tool that y'all use for accessibility for school board meetings, for my kid who's instructional time is not prioritized or even accessible to her, yet the same excuse— "we must protect instructional time" was used to cut band by 33% and moved to recess.
>
> We have done literally everything to get her to see our kid, including now get escorted out of a school board meeting— that wasn't supposed to be on my Bingo Card—and I bet tomorrow, still crickets from our superintendent who stands in the gallery and says, "we pull every child in and meet them where they are." Not every. There are the ones outside the building who cannot get in. I guess they don't count.

*Id.* ¶ 118.

On October 18th, Ms. Nadeau emailed Ms. Doe, attempting to reframe the incident as an "offer" to step out of the board room, even though Ms. Doe had been given no choice but to leave the meeting room:

> Please know that the abrupt ending to your advocacy was not to curtail it, but to protect your child's privacy.
>
> I also want to emphasize that the end result of your advocacy during Monday's public comment was not that you were escorted out of the Board meeting.
> Gayle offered to step out of the Board room with you to provide information to you; the content of your comments could not be shared at that time, in that forum, because of confidentiality, as I noted during our meeting.

*Id.* ¶ 119.

Even though Ms. Doe had followed RSU 21 School Board Rule KE by going to Jane's 504 team, then to Principal Bouchard, and finally through a written statement of complaint to Superintendent Cooper (with no response), Ms. Nadeau instructed her to address the issue with Jane's 504 team:

We are not allowed to entertain those types of conversations during public comment, and as much as we empathize with you wanting what you feel is best for your child, we are also not the subject matter experts in your family's situation, nor is it in our purview to take action on it. The conversation that needs to take place is between you and the team with whom you developed a plan for your child. If you do not agree with the plan developed, you have the right to file a dispute. Because we are not the subject matter experts, I would look to the professionals on your team for both the conversation that needs to be opened, and next steps in the process if what you develop is not working.

*Id.* ¶ 120.

On October 24, 2023, Jane's parents attended a 504 Plan meeting with 504 Coordinator Tara Skiff; Assistant Superintendent Anita Bernhardt; Special Education Director Rachel Bratter; Jane's 504 case manager, Brian Grant; Special Education Teacher Brooke Ireland; Social Worker Tracy Flagg; and Jane's therapist, Karen Matthews. *Id.* ¶ 121. Jane's parents were surprised to see Assistant Superintendent Bernhardt at the meeting. *Id.* ¶ 122. She had not been on the distribution list for the meeting invitation, nor was she part of Jane's 504 Team. *Id.*

During the meeting, Ms. Bratter did the exact opposite of what she had said during their October 2 meeting, recommending a referral for special education evaluation, which takes 45 school days to complete. *Id.* ¶ 123. Ms. Doe pointed out that, at their prior meeting, Ms. Bratter had stated that Jane would not qualify for special education: "What changed?" *Id.* ¶ 124.

Ms. Bratter replied: "It's not that she's going to qualify or not qualify for special ed. In order for me to be able to do these evaluations, I have to move forward with the referral process. We can't do evaluations without moving forward with a referral." *Id.* ¶ 125. This was an abrupt change of position, as Ms. Bratter had indicated on

October 2 that there was no legitimate reason to evaluate Jane for special education eligibility or services. *Id.*

Ms. Doe said, "We're so exhausted and she's exhausted and I don't know what these other tests are going to do when we've been telling you all along the things she needs: this remote access into that classroom, which is afforded to other kids in this district." *Id.* ¶ 126. Ms. Bratter replied: "That's a different conversation." *Id.* Ms. Doe asked, "Why would that be a different conversation?" *Id.* ¶ 127. Ms. Bratter replied that remote access was not an option for any student in the district: "There are no students currently receiving remote access. There are absolutely no students receiving remote access." *Id.*

Ms. Doe responded:

> The technology exists. And it exists for kids in this district. And my kid has never been offered it. It has never been put on the table. In the last meeting that we were here, you said, "Absolutely not, there's nothing that can do that in this district." Where there is a kid who does have it.

*Id.* ¶ 128. Ms. Doe clarified again that they were not seeking a different curriculum or permanent remote access, but merely sought a way to acclimate Jane remotely over a period of weeks, with the goal of getting her back in the classroom in person shortly. *Id.* ¶ 129. She showed Ms. Bratter online photos of other students using telepresence robots, saying that if Jane had had such a robot early in the year, she now would be attending school full-time. *Id.* Ms. Bratter repeated that RSU 21 would need special education assessments to proceed but acknowledged that there are "some students that will have digital remote access due to medical things, and things like that." *Id.* ¶ 130.

33

Ms. Doe had learned of a company called Grahamtastic Connection in Sanford, Maine that provides services to students seeking remote access to education, including telepresence robots.  *Id.* ¶ 131.  The student at Kennebunk Elementary was using a Grahamtastic telepresence robot.  *Id.*

A Facebook post dated September 25, 2023 from the family of that student had two photographs side by side—the first picture was of a child alone in a room with his hand on a laptop keyboard, and the second picture was of the laptop's screen, which showed his robot's view of a school hallway.  *Id.* ¶ 132.  The caption said: "[Student] got to drive his @grahamtasticconnection device thru the hallway at school today! When he was logging off all his classmates gave his robot a hug for him. It was so cute."  *Id.*

Another Facebook post from that family from September 29 also had two photographs—the child's laptop screen, showing the robot's view of a note on a classroom bulletin board, and a closeup of the note itself, which said: "[Student's name]! Glad you are here! Please back up to join us. ♥Ms. Wells."  *Id.* ¶ 133.  The post's caption read: "[Student's] teacher has this note for him when he logs onto his @grahamtasticconnection! It was the first time we'd seen it because his teacher usually has the robot turned around already!"  *Id.*

During the 504 plan meeting on October 24, 2023, Ms. Bratter presented the hypothetical of what would happen if Grahamtastic were to provide the Does with a robot for Jane's use.  *Id.* ¶ 134.  In response to Ms. Bratter, Assistant Superintendent Bernhardt stated, "We would not allow that in their case."  *Id.*

On October 25, 2023, Ms. Doe emailed Assistant Superintendent Bernhardt and Ms. Bratter to ask whether Jane could use the Grahamtastic technology to access her classroom:

> Hi Anita and Rachel –
>
> I just want to make sure I understand correctly about a conversational volley during yesterday's meeting.
>
> Do I understand the district has already decided they will not permit [Jane] use of a device and technology that other kids have access to in our district right now so they can access their peers, classroom, and stay connected while she continues to integrate fully into the classroom? Even though there is a device used in-district by kids in our schools right now, a grahamtastic robot, regardless of who controls the device, our child would be denied use of this tool or similar tools, even if we were to make a case with the company that handles them for our child's situation? That our therapist, pediatrician, and everyone at the table a month ago all agreed that exposure therapy through a 504 was the right course of action, and specifically advised against assessments and testing because it would be too much for [Jane] and wouldn't change our course of action—and we are doing exposure therapy based on the advice of her pediatrician and therapist because remote access tools for integration purposes is/was not available to her 9 weeks ago and has never been available to her.
>
> Do I understand this correctly? I appreciate any clarifications.

*Id.* ¶ 135.

Ms. Bratter sent the following message in response to Jane's parents:

> As is appropriate under Section 504 we are following the 504 Team decision to provide exposure therapy through an Alternative Education plan. [Jane] has demonstrated increasing growth in her ability to access the middle school and staff in the building as discussed at yesterday's 504 Alternative Education review meeting. Our proposed next steps are to continue the existing Alternative Education plan with revisions based on the team discussion and, with your parental consent, to collect additional data through the district IEP referral and evaluation process. This data may provide important insights to assist the team in escalating [Jane]'s progress and provide her with tools for future

success.  Our steps as we continue to partner in our support of [Jane] will be directed by the team decision-making process for [Jane] under ADA.

*Id.* ¶ 169.

The same day, Ms. Doe responded: "Cool—can you answer the question?"  *Id.* ¶ 137.  She copied and pasted the same question into her email, about whether the District had decided not to permit Jane to use the Grahamtastic robot, even though RSU 21 had allowed other students in the district to use it.  *Id.*

By October 31, 2023, no one from the District had responded, prompting Ms. Doe to write again:

> Hi all, it's been a few days and I didn't want this to go without answers.
>
> In writing.
>
> I'll make it as easy as possible. Just yes or no answers, no fluff, to all of the below:
>
> Do I understand the district has already decided they will not permit [Jane] use of a device and technology that other kids have access to in our district right now so they can access their peers, classroom, and stay connected while she continues to integrate fully into the classroom? Yes or no.
>
> There is a device used in-district by kids in our schools right now, a grahamtastic robot, regardless of who controls the device, our child would be denied use of this tool or similar tools by the district, even if we were to make a case with the company that handles them for our child's situation? Yes or no.
>
> That our therapist, pediatrician, and everyone at the table a month ago all agreed that exposure therapy through a 504 was the right course of action, and the team specifically advised against assessments and testing because it would be too much for [Jane] (unnecessary and potentially traumatizing was the language used then) and wouldn't change our course of action-yes or no.

36

> We are doing exposure therapy based on the advice of her pediatrician and therapist because remote access tools for integration purposes is/was not available to her now 10 weeks ago and has never been available to her. Yes or no.
>
> I would appreciate an expedient reply—simple yes or no— to each of the above, so [Mr. Doe] and I can decide if we should follow the district's change of course on the recommended plan for [Jane].

*Id.* ¶ 138.

> The next day, November 1, 2023, Ms. Doe emailed again:
>
> Hi there! Me again—as it's been a week since I've asked these questions with no direct answers to the questions I've asked, I'm really hoping to get simple yes or nos to all of these. Please respond today. They shouldn't be that hard as they seemed to be a point of discussion in the meeting, and you seemed to have all the answers in the meeting. I just need clarification to make sure I'm understanding what happened. I'd appreciate a reply today. It's been a week and we are eager to figure out how to proceed as [Jane] is the one now 10 weeks out, suffering without instructional time.

*Id.* ¶ 139.

Ms. Bratter responded, copying Superintendent Cooper: "These are great questions that should be reviewed and discussed as a team. We are happy to schedule a Google Meeting next week to provide additional clarification." *Id.* ¶ 140. Ms. Doe responded that a meeting was not needed:

> I don't think it's necessary for a team meeting for this. These are simple questions that are all Yes or No. We don't need to bother the team with this. Can you please clarify in writing so I am no longer confused as you and Anita were the ones to field these questions, or similar, in the 504 meeting a week ago. Thank you. Here they are again for your convenience. After a week of not getting a simple yes or no, it's starting to look like the district does not want to say anything in writing, which is concerning. The first two questions can easily be answered.

*Id.* ¶ 141.  Ms. Bratter sent a reply email on November 2 in which she did not answer the questions and instead sent the minutes from the October 24 meeting and offered to hold yet another meeting:

> I hope this message finds you well. I understand that you have declined the offer for a meeting to address the specific questions you have provided. Your concerns are important to us, and we want to ensure that we address them adequately.
>
> I want to reassure you that we take your questions seriously and to provide you with the most accurate and detailed information, we have attached the meeting minutes from the most recent 504 review and IEP referral Meeting which were shared on October 30, 23.
>
> Please review these meeting minutes as a written response to your questions based on the team discussion where these questions were originally addressed.
>
> If, after reviewing the meeting minutes, you find it necessary to schedule a Team Google Meeting to further discuss any points or seek additional information, please do not hesitate to reach out.
>
> We are here to support you.
>
> Thank you for your patience and understanding as we work together to address your concerns thoroughly.

*Id.* ¶ 142.

> Ms. Doe replied by email:
>
> Rachel—Please make the following adjustments to the minutes that are inaccurate:
>
> "[Ms. Doe] stated [Jane] can do her academics and is capable of learning. [Ms. Doe] expressed frustration that a student at KES has remote learning. Rachel, Director of Special Services, explained that the district policies do not offer remote learning at this time. Rachel explained the situation related to the KES student and that student does not access remote learning. There are no students in RSU21 that access remote learning."

38

While semantically this is probably accurate-ish, I want this to be perfectly clear: We have been, and always have been, pushing for REMOTE ACCLIMATION and remote access to her classroom—remote integration into her classroom so she can hear her teachers, participate socially and INTEGRATE into the classroom as part of her anxiety diagnoses, as part of exposure therapy in the most expedient and kind manner for this child who has now (as of today) missed 11 weeks of instructional time and still is unable to access a classroom. All while we continue with physical, in person exposure therapy as part of a multipronged approach. Using a tool that other children can use in your district.

We do not, nor have we ever wanted, remote school or "remote learning" for [Jane] as the district understands the term. We have made that perfectly clear. The intention is, and always has been, to integrate her into the classroom using a tool (that we now know other kids have access to in this administration from you and the administration to the contrary) to keep them connected to their classrooms and teachers and community. That language must be clearer in these documents.

We are looking for remote ACCESS to her classrooms -like other kids in the district have—remote INTEGRATION so she can get into her seat as soon as possible as a 504 accommodation, and remote ACCLIMATION so she can be a full participant in her learning.

Please make those adjustments ASAP.

*Id.* ¶ 143 (emphasis in original).

On November 9, 2023, Jane's pediatrician, Dr. Lock, wrote a letter of medical necessity. *Id.* ¶ 144. In her letter, Dr. Lock stated that it was medically necessary for Jane to have "video access into the classroom":

[Jane] is under my care for anxiety. Her next appointment in this office is 11/22/23 to discuss her medication management, and she continues under the care of a therapist. To date, [Jane] attends school for 1 hour daily with the support of the school social worker but is not attending any classes.

It is medically necessary for [Jane] to be provided with the following in order to effectively treat and/or manage this diagnosis:

All reasonable and appropriate accommodations to increase her familiarity with the school environment and allow for participation, including but not limited to the use of a full time 1:1 paraprofessional and video access into the classroom either from home or from school, to support the agreed-upon goal of full return to daily in-class participation as soon as possible.

*Id.*

The Does provided Dr. Lock's letter to the District, stating: "We are asking you once again to please consider this accommodation request so that [Jane] can transition to full classroom participation as soon as possible." *Id.* ¶ 145. The District did not respond. *Id.* ¶ 146.

Jane's parents then contacted Leslie Morissette, Founder and Executive Director at Grahamtastic Connection. *Id.* ¶ 147. Through a series of emails on November 13, 2023, Ms. Morissette confirmed that Grahamtastic had a robot available to be dropped off at Jane's school. *Id.* Ms. Doe emailed Ms. Morissette: "We're curious if the district responded to you at all about [Jane]? We're obviously hopeful after a full 12 weeks to get her access to her classrooms so she can fully participate in person asap. She's eager to finally integrate into her classrooms, too!" *Id.* ¶ 148. Ms. Morissette responded: "No response as yet, I will loop back with principal." *Id.*

On November 28, 2023, Ms. Doe emailed Principal Bouchard about the Grahamtastic paperwork:

Hi Marty!

On November 13, it's our understanding Grahamtastic sent paperwork so they could bring in assistive technology other students in RSU 21 have access to when they cannot be fully present in a classroom, on a

temporary basis. It's also our understanding that Leslie from Grahamtastic followed up, you sent another request to the district to address the paperwork for approval for [Jane].

When you sent the requests to the district, who was emailed? It's been weeks and as we know, every day the administration holds this paperwork up, [Jane] is still at a kitchen table or outside a classroom without a teacher or peers for the bulk of her time.

When I reached out to Grahamtastic today, Leslie said you followed up with the district—but they haven't responded. Can you let me know who was contacted in the district?

*Id.* ¶ 149. Mr. Bouchard answered that he had forwarded the paperwork along to Ms. Bratter, Assistant Superintendent Bernhardt, and Superintendent Cooper:

I was asked to forward the email to Rachel Bratter, Anita Bernhardt and Dr. Cooper the day I received it and did so. Leslie did check in with me the other day, however, as I told her, I have not heard a response. I hope [Jane] has a great day!

*Id.* ¶ 150.

On November 28, 2023, school psychologist Tara Skiff emailed Mr. Doe about Dr. Lock's note regarding video access to the classroom: "I apologize that no one had responded in regards to this doctor's note. I did want to inform you that I have added this document into [Jane]'s 504 file for reference." *Id.* ¶ 151. Mr. Doe replied:

Thanks for adding it to the file. When can we expect a response regarding the indicated necessary accommodations (full time 1:1 paraprofessional and video access into the classroom)? It is almost three weeks since this was provided, and we have not received a response one way or the other.

*Id.* ¶ 152. Ms. Skiff did not answer but offered to hold another meeting:

Thank you for the email. We can take the medical recommendations from the note you provided and discuss with [Jane]'s educational team, which is Section 504. The 504 team, which includes both of you, can have these discussions to make any changes to the plan, if warranted.

> Please let me know your availability within the next few weeks to schedule the meeting.

*Id.* ¶ 153.

On November 3, 2023, the District gave Jane's parents a form asking them to consent to a special education evaluation that Jane's 504 Team had discussed a month earlier on October 2 and ruled out as "unnecessary" and "potentially traumatizing." *Id.* ¶ 154. On November 30, 2023, the Does indicated on the form that they did not consent to the evaluation. *Id.*

On December 1, 2023, Ms. Skiff invited Jane's parents to another 504 Team meeting, scheduled for December 19, 2023. *Id.* ¶ 155. The Does noticed that Assistant Superintendent Bernhardt had been invited, despite not being part of Jane's 504 team. *Id.* Ms. Doe responded: "Anita Bernhardt is not part of [Jane]'s 504 team and we do not want her in attendance." *Id.* Ms. Doe objected to the December 19 date, to no avail, because that would ensure that Jane would be out of school for over four months. *Id.* ¶ 156.

The District went forward with the 504 Team meeting on December 19, 2023 and the Does attended. *Id.* ¶ 157. They specifically requested a response to the medical necessity letter concerning Jane's need to be provided with remote access to her classrooms at MSK. *Id.* Principal Bouchard replied that, per the superintendent and school board, RSU 21 will not permit virtual access. *Id.*

The 504 Team then informed the Does that, even though they have been entering MSK with Jane to assist her as "visitors" (checking her in and out of school during her limited attendance there), they would no longer be allowed to sign in and

stay on the premises beginning in January and that Jane would have just five days to acclimate to a full drop-off schedule. *Id.* ¶ 158. Principal Bouchard stated that things could "get ugly" if the Does did not comply. *Id.* This edict from the District is likely to result in a disastrous setback for Jane, who struggles daily with the challenge of entering the MSK building. *Id.*

A typical school day at MSK runs from 7:30 a.m. (9:00 a.m. on Wednesdays) to 2:00 p.m. *Id.* ¶ 159. Students attend six blocks of instruction per day, with core classes (math, language arts, science, and social studies) meeting daily. *Id.* Currently, Jane receives only 50 minutes of instruction per day, usually from the hallway without entering her classroom or seeing her teachers. *Id.* Her panic attacks have been so bad that she cannot cross the threshold into most of her classrooms. *Id.* The only classes she can currently enter successfully are Spanish, physical education, and art. *Id.* She eats her lunch in a private room with a single classmate as the cafeteria is too overwhelming. *Id.* At most, she receives two blocks of instruction per day (1 hour and 40 minutes). *Id.* The rest of the day she attempts to do work posted in Google Classroom from home, largely on her own. *Id.*

## C.    The District's Factual Response

### 1.    Marty Bouchard's Sworn Declaration

Mr. Bouchard is the Principal of MSK and is familiar with Jane Doe and her parents. *Bouchard Decl.* ¶¶ 1-2. Mr. Bouchard says that he has worked closely with members of the District's Special Services Department, including a psychologist, social workers, and counselors, "who have been involved in efforts to help Jane Doe overcome barriers, created by her anxiety, to accessing an education at MSK." *Id.* ¶

43

3.  Mr. Bouchard avers that since the start of the 2023-2024 school year, "the Special Services Department has formulated, modified, and tried to implement a process of gradually introducing Jane Doe to the school environment, so she would become equipped to eventually attend school in person on a full-time basis." *Id.* ¶ 4.  Mr. Bouchard asserts that he has "observe[d] Jane Doe's progress, as she slowly has increased her in-person attendance at school, albeit with some setbacks." *Id.* ¶ 5. Mr. Bouchard states that occasionally, Jane's in person attendance involves her presence in the classroom, but "more commonly, it involves sitting in the hallway outside a classroom, where she can monitor what is happening in the classroom through an open door." *Id.* ¶ 6.  Mr. Bouchard describes Jane as "increasingly relaxed and happy at school." *Id.* ¶ 7.  Mr. Bouchard concludes that it is his "strong belief that the members of [the District's] Special Services Department have worked to the very best of their ability to serve Jane Doe's needs." *Id.* ¶ 9.

## 2.   Rachel Bratter's Sworn Declaration

Ms. Bratter is the Director of the Special Services Department of the District. *Bratter Decl.* ¶ 1.  Ms. Bratter set forth her experience, including having worked for seventeen years with students with disabilities, including students whose disabilities inhibit their capacity to regularly attend school.  *Id.* ¶¶ 3-5.  Ms. Bratter confirmed that Jane Doe is eligible for a 504 plan and the 504 team has put accommodations into place to help her gain access to education, *id.* ¶¶ 6-8, but Ms. Bratter observed that because Jane Doe did not sign the consent forms necessary for special education, she has not qualified for special education status.  *Id.* ¶ 9.

44

Ms. Bratter said that she was aware that Jane had experienced difficulty attending school because of her anxiety. *Id.* ¶ 11. Ms. Bratter described the plan the Special Services Department developed to gradually introduce Jane to the school setting by starting the school day with social work services and attending class by sitting in the hallway outside the class or occasionally attending class itself. *Id.* ¶ 13. Ms. Bratter opined in her professional experience that providing students who suffer from anxiety with remote alternatives instead of in person ones, has been demonstrated to have "potential drawbacks." *Id.* ¶ 14. Ms. Bratter said that remote alternatives may "inadvertently foster a tendency for students to avoid attending school in person" and, by allowing them to stay at home where they are more comfortable, remote alternatives may "inadvertently discourage in-person attendance." *Id.*

Ms. Bratter wrote that on September 13, 2023, Brian Grant, School Counselor, made a 504 referral concerning Jane Doe because she was having difficulty attending school due to anxiety. *Id.* ¶ 15. On September 14, 2023, the District held a 504 Team meeting to discuss Jane Doe's situation. *Id.* ¶ 16. The 504 Team consisted of Mr. and Ms. Doe, the school Principal, several of Jane's teachers, a school counselor, and a nurse. *Id.* At the September 14, 2023, Ms. Bratter said that the 504 Team, including the parents, agreed on the following plan:

> (1) Allow for a modified school day; (2) Allow access to designated spaces or people within the school, as needed; (3) Permit doodling/drawing/writing during class; (4) Provide work for classes when absent; (5) Not use "all calls" to call Jane to the office; (6) Allow access to social workers/school counselors, as available; and (7) Allow access to digital

> resources, (i.e., Google Classroom, copy of class notes or teacher recorded directions associated with assigned classwork/assignments).

*Id.* ¶ 17. Ms. Bratter said that MSK staff immediately set about working with Mr. and Ms. Doe as well as Jane in implementing the agreed-upon 504 plan. *Id.* ¶ 18. On September 25, 2023, Anne Morrissey, the Administrative Support Specialist, sent the 504 Plan documentation to Mr. and Ms. Doe. *Id.* ¶ 19.

On the same day, September 25, 2023, Ms. Doe sent an email to District staff, requesting a special education referral, and Ms. Bratter responded the same day, confirming that someone would be in touch with her to set up a special education referral meeting. *Id.* ¶ 20.

On September 26, 2023, Ms. Bratter emailed Mr. and Ms. Doe, thanking them for bringing Jane to school that day and identifying progress Jane had made. *Id.* ¶ 21. Ms. Bratter provided Mr. and Ms. Doe with a detailed plan with set timelines for moving forward:

> Thank you for bringing [Jane Doe] in today. We were in the building for over an hour and she made great eye contact and did respond to both Marty and me! I know that does not seem like a big step, non[e] the less it was a step forward. As a follow-up to our conversation, after the referral meeting on Monday, we will discuss a plan going forward and what that will look like with set timelines. I was able to speak with both Greg Hesse-Stromberg and Tracy Flagg (School Social Workers). I gave them a little more information about where [Jane Doe] is currently and what we would like to see by Friday of this week. I also mentioned to them why we were adding their services to this process. I know you have been working with Brian Grant and you had so many positive things to say, [Jane Doe] has made it clear she is not ready to make a connection with him so we will try another direction. As I mentioned, a bonus this week is the 7th grade students are all away at Camp, so there are a lot fewer students moving around the building.

As promised, below is a plan for the next few days.

**Wednesday, September 27th, 8 am** at the front door meeting MS. Tracy Flagg (Mom and/or Dad starting but not leaving)
The goal is to try and have [Jane Doe] work her way up to Tracy's office this is at the top of the stairs where we were standing today on the right. Very little time in the hall and an opportunity to see her space and start to build a connection. This would be for 30 minutes (Tracy has a meeting at 8:30 a.m.)

Second visit to the school same day:

**Wednesday, September 27th, 12:30-1 p.m.** Return to the school, this time Greg Hesse-Stromberg (Mr. H-S) will meet at the front door (Mom and/or Dad starting but not leaving) and together all walk to the same area where Tracy's office is to see Greg's office and again try to build some rapport and get comfortable in the space.

**Thursday, September 28th, 12:30-1:30** Mr. H-S and/or Ms. Flagg will meet [Jane Doe] at the front door.  (Goal for parents to hand off [Jane Doe] at the door if not at the door walk her to the Social Work offices and then either leave or wait in the car for the hour.)  Both Mr. H-S and Ms. Flagg would like to meet with [Jane Doe] alone without parents if possible.  They will work on reading the moment to see if [Jane Doe] is ready for the gentle nudge forward in the relationship-building process. Both Mr. H-S and Ms. Flagg understand [Jane Doe] might break down and they could end up either standing out front for the hour or having [Jane Doe] in the office with no communication.  They are willing to wait her out as part of her processing at her own speed.  They will look into providing some coping strategies for the family to work on as part of the process.

**Friday, September 29th, 12:30-1:30** Mr. H-S and/or Ms. Flagg will meet [Jane Doe] at the front door.  Working from where in this process [Jane Doe] has left off.  (I can not outline where she will be.)  Over the weekend [Jane Doe] will visit the MSK property with one or both parents on both Saturday and Sunday: maybe bringing her dog for a walk around the property.  Have some conversations about strategies for working with Mr. H-S and Ms. Flagg.  [Jane Doe] could think of a few things that went well on Tuesday, Wednesday, Thursday, and Friday and how they can work well in the coming week while at MSK. Finding successful baby steps is extremely important for [Jane Doe] to make faster progress in transitioning to full-time participation at MSK.

**Monday, October 2nd, 8am – 8:30** [Jane Doe] will meet with Ms. Flagg at her office while the IEP referral team meets.  At 8:30 [Jane Doe] will meet with Mr. H-S and if she feels comfortable a few MSK folks

to talk about her steps moving forward for the week of October 2nd – October 6th.  Between today and Monday, October 2nd, Mr. H-S is going to check in with [Jane Doe's] teachers to see if they are able to meet with [Jane Doe] during the weeks of October 2nd-13th from 2:05-2:30/45 p.m. depending on their availability to work on her academics.  The goal would be to "catch" her up to where her peers are to help reduce any added concern of not being in the same academic place as her friends when she returns to the classroom while building a relationship with the teacher/s.  Mr. H-S will let me know when he has more information from the team.  Mr. H-S is also going to mention to the team your offer to bring in your dog for some introduction to how you work with animal science.  I think I covered all of my notes.  Please let me know if you have any questions or concerns as we work through this together.

Thank you
Rachel

*Id.*

The next day, on September 27, 2023, Ms. Doe sent an email saying that Jane Doe had had her first day in school without a panic attack.  *Id.* ¶ 22.  Ms. Bratter said she considered this to be excellent progress.  *Id.*

On September 29, 2023, both Mr. Hesse-Stromberg and Ms. Flagg reported that they were seeing improvements in Jane Doe.  *Id.* ¶ 23.  For example, on that date, Mr. Doe brought Jane Doe into the school with ease.  *Id.*  Jane Doe brought completed work, had her art displayed, and played a card game with Ms. Flagg.  *Id.*

On October 2, 2023, there was a Special Education Team meeting that Ms. Bratter attended.  *Id.* ¶ 24.  At the meeting, Mr. and Ms. Doe asked about remote learning.  *Id.*  Ms. Bratter responded that the District was focused on bringing Jane Doe back into school full-time, but Jane Doe's option would be to participate in a "virtual academy" to supplement her work at MSK at no cost to the Does.  *Id.*  Ms. Bratter assured the Does that she was willing to work with them to integrate Jane Doe into the school.  *Id.*  The other professionals at the October 2, 2023 meeting

48

observed that the 504 Plan was less than a month old, that Jane Doe had made progress, and that the best course of action would be to incrementally increase Jane's exposure to school. *Id.* ¶ 25. At the end of the October 2, 2023 meeting, the 504 Team decided not to refer Jane Doe to special education and to continue the plan to integrate her with the school. *Id.* ¶ 26. Mr. and Ms. Doe were not happy with the outcome and complained that Jane Doe was not receiving the public education to which she was entitled. *Id.* By the District's assessment, Jane Doe continued to make progress, albeit slowly, at MSK. *Id.* ¶ 27.

On October 17, 2023, Ms. Doe sent an enthusiastic email to the 504 Team, entitled "A great success from [Jane Doe]." *Id.* ¶ 28. Ms. Doe noted that Jane had walked in, ignored her, laughed and played with Ms. Flagg, felt safe, worked on building a foundation, and communicated. *Id.* Ms. Doe acknowledged it was a "big win." *Id.*

On October 24, 2023, the 504 Team met to amend the 504 Plan. *Id.* ¶ 29. The Team that met on this date included Ms. Bratter, Mr. and Ms. Doe, a school psychologist, the school principal, the assistant superintendent, a school counselor, a non-school family therapist, a school social worker, and a special education teacher. *Id.* The 504 Team retained the seven factors in the September 14, 2023 plan, and added:

> (8) Consistent grading across all teachers; (9) Do not discount student. She should be acknowledged in regard to work completion and academic expectations; (10) Aligning schedule/classes with known teachers. Provide schedule ahead of time; (11) Prepare student for changes in schedule and routines by meeting all teachers and location of rooms as schedules change; and (12) Limit verbal language/prompting.

*Id.* At the meeting, Ms. Bratter and Ms. Flagg discussed Jane Doe's progress. *Id.* ¶ 30.

Remote learning was also discussed at the October 24, 2023 meeting. *Id.* ¶ 31. Post-COVID, the District had adopted a policy against students attending school remotely, and Ms. Bratter believed that, in light of this policy, it was her obligation to find a way to accommodate Jane Doe. *Id.* ¶¶ 31-32. Ms. Bratter recalls that Assistant Superintendent Anita Bernhardt stated that remote instruction would not be used in Jane Doe's case at that time. *Id.* ¶ 33. The 504 Team did not add remote learning to the 504 Plan and instead focused on exposure therapy. *Id.* At the same time, the Team set Jane Doe up with an online math program to supplement classroom instruction and discussed tutoring with a contractor and virtual academies. *Id.* Mr. and Ms. Doe declined the contractor and virtual academies options. *Id.* Although Jane Doe was making progress, it was slower than desired, and the Team agreed to make a special education referral. *Id.* ¶ 34. Mr. and Ms. Doe said they would discuss the special education referral at home and decide whether they agreed with the referral. *Id.*

Mr. Hesse-Stromberg continued to communicate with Mr. and Ms. Doe and to emphasize the importance of Jane Doe's exposure to middle school with a goal of having Jane enter school without her parents. *Id.* ¶ 35. On October 10, 2023, Mr. Hesse-Stromberg emailed Mr. and Ms. Doe about remote learning:

> Now that she's gaining some trust and comfort with us, I feel it's important to continue moving forward in helping her to manage her anxiety not only in specific situations, but in all aspects of her life. As

50

we have seen, she is feeling more comfortable being a short distance away from one of you, but continues to look for that reassurance whenever the situation might change.  I'm concerned that this is a short term fix that will slowly help her to feel comfortable in the circumstances we have now at school, but won't address the anxiety as a whole, and will lead to a repeat of these challenges when situations change. Ultimately, our goal as a school is to help [Jane Doe] figure out ways to manage her anxiety and to handle that in whatever situations she faces.

Throughout my career, I have worked with many students who experience extreme anxiety and struggle to manage those emotions.  The approach that I've found most effective comes from the work of Lynn Lyons, who is considered one of the world's leading experts on child and adolescent anxiety treatment.  Her approach is to recognize that anxiety is always going to show up, because it is anxiety's job as part of our survival instincts to be there.  However, it is important to recognize that this anxiety looks to have control of us, striving for everything to be comfortable and predictable.  Lynn describes anxiety as a cult leader, because as long as we do what it wants, everything is fine, but it will continue to request that we do more and more to gain that comfort and certainty.  In order to get out of the cult, we need to recognize that the demands are unrealistic and that we need to stand up for ourselves. When we meet the demands that it's making, we are reinforcing that anxiety and giving it more power …

Ultimately, I believe we are all looking toward the same goals of helping [Jane Doe] be her best as a student and to fully integrate her back into school.  We are ready to move forward and believe [Jane Doe] is ready to make the next step, but moving forward needs a consistent team focus.  Like any child, [Jane Doe] will take cues from her parents and having a consistent message of safety from you is an important part of this.  With that in mind, a plan needs to include her stepping into the building without a parent, or a plan to have that parent leave shortly after.  She will be with trusted adults that she has built relationships with.  This needs to come from the two of you as well as from us, so as to avoid any perception that we are trying to trick her in any way.  We look forward to working collaboratively with you to determine what the best next steps are and which blocks [Jane Doe] should attend.  Please let me or anyone on the team know if you have any questions.

*Id.* ¶ 35.  Mr. and Ms. Doe disagreed with Mr. Hesse-Stromberg's recommendation and insisted that they continue to enter and remain in the middle school while Jane Doe was in attendance.  *Id.* ¶ 36.

On October 24, 2023, the 504 Team referred Jane Doe to an IEP Team to determine whether special education was needed to address Jane Doe's social phobias.  *Id.* ¶ 37.

On October 26, 2023, Ms. Doe sent an email entitled, "Win for [Jane Doe] yesterday."  *Id.* ¶ 38.  Ms. Doe reported that Jane Doe had been able to successfully walk away from Brian Grant and go down the hall with just Tracy Flagg to her Language Arts teacher's class, and that Jane Doe had felt accomplished.  *Id.*

On November 3, 2024, Lauren Carney, Student Data Specialist at the District, contacted Mr. and Ms. Doe to see whether they would give permission for a special education referral and stated that the District needed their permission to move the special education process forward.  *Id.* ¶ 39.  Mr. and Ms. Doe did not give their consent and the special education process did not proceed.  *Id.*

On November 9, 2023, Mr. and Ms. Doe provided the District with a letter from Jane Doe's physician recommending that Jane Doe be allowed remote access learning as a medically necessary accommodation.  *Id.* ¶ 40.  This medical documentation was to be reviewed at the next 504 Team meeting.  *Id.*

Also on November 9, 2023, Ms. Flagg reported that Jane Doe was able to participate in Language Arts from the hallway, that Jane had made progress, and that Ms. Flagg hoped for continuing progress.  *Id.* ¶ 41.  Ms. Flagg, Mr. Grant, and

Jane Doe agreed that Jane would participate in classes from the hallway, participate with her computer, and listen to instructions from the teacher.  *Id.* ¶ 42.  Jane Doe was also working toward having lunch with her peers.  *Id.*

On November 17, 2023, Ms. Flagg reported that Jane Doe stated she was having a terrific week and gave two thumbs up to continuing to move forward.  *Id.* ¶ 43.  Jane Doe rated herself an "11" when asked to rate herself on a scale of 0 to 10.  *Id.*  Jane Doe was on board with the school plan and maybe having her parents be in the parking lot and not inside the school.  *Id.*

On November 20, 2023, Ms. Doe shared positive feedback regarding the school plan concerning classes but disagreed with the proposal to have her and/or her husband remain outside the school building.  *Id.* ¶ 44.  At the end of November 2023, Jane Doe was making good progress at school with her classes.  *Id.* ¶ 45.

However, on December 5, 2023, Ms. Doe reported that over the last two days, Jane Doe had experienced a panic attack going into school.  *Id.* ¶ 46.  On December 5, 2023, Ms. Bratter was working on obtaining a tutor for Jane Doe, and the plan was to discuss Jane Doe's panic attacks at the next 504 Team meeting scheduled for December 19, 2023, and to have the tutor start working with Jane Doe after the winter break on January 2, 2024.  *Id.* ¶¶ 47-48.

Also in early December 2023, Ms. Bratter and her colleagues agreed that it would be beneficial to have a Board Certified Behavior Analyst (BCBA) work with Jane Doe.  *Id.* ¶ 49.  Although Mr. and Ms. Doe allowed Will Putnam, the Assistant Director of Special Services, attend the 504 Team meeting, they were unwilling to

have the BCBA attend the meeting, not because they objected to the BCBA's involvement but because the BCBA had not met Jane Doe. *Id.*

On December 11, 2023, Ms. Flagg reported that Jane Doe had participated in Spanish class the previous Thursday and in Physical Education the previous Friday. *Id.* ¶ 50.

The 504 Team met on December 19, 2023 to amend the 504 Plan and agreed that the District would add daily tutoring to the 504 Plan beginning January 2, 2024. *Id.* ¶¶ 51-52.  The Team also modified the social work services accommodation from direct service to consultation service. *Id.* ¶ 52.  The 504 Team modified the 504 Plan to add a thirteenth element: (13) Provide daily tutoring services. *Id.* ¶ 53.  Although the 504 Team thought it would be better if the Does remained outside the school building, the Does disagreed. *Id.* ¶ 54.  On December 20, 2023, the District approved the Does continuing to come into the building for five additional days after the winter break. *Id.*

On January 5, 2024, the Does signed a Consent for Behavioral-Analytic Services. *Id.* ¶ 55.  Because the BCBA would begin to work with Jane Doe and because the Does disagreed with the District's position that they should remain outside the building, the District agreed to allow them to enter and remain in the building pending the BCBA assessment. *Id.* ¶ 56.  This was communicated to Ms. Doe on January 5, 2024. *Id.*

Also on January 5, 2024, Ms. Doe inquired about tutoring services for Jane Doe when she was not at school. *Id.* ¶ 57.  On January 9, 2024, the District informed Ms.

54

Doe that they had arranged for a tutor to attend all Jane Doe's classes and be available to tutor her during school as well as before and after school, either at school, remotely, or at a neutral location such as a public library. *Id.* ¶ 58.

As of late January 2024, the BCBA assessment had not been completed and was due in February 2024. *Id.* ¶ 59. The BCBA is free to recommend whatever she thinks is appropriate for Jane Doe, including remote access. *Id.* ¶ 60. Ms. Bratter represented that if the BCBA recommended remote access, the District was prepared to implement it. *Id.*

Ms. Bratter said that Jane Doe was on an abbreviated schedule and was on track to complete the sixth grade. *Id.* ¶ 61.

### 3.     Gregory Hesse-Stromberg's Sworn Declaration

Gregory Hesse-Stromberg, a Licensed Clinical Social Worker employed by the District, *Hesse-Stromberg Decl.* ¶ 1, submitted a sworn declaration confirming the contents of his October 10, 2023 email on remote learning to the Does that is quoted above. *Id.* ¶¶ 4-5. Mr. Hesse-Stromberg wrote:

> The email quoted at length . . . accurately summarizes my professional opinion, which is that gradual and increasing exposure to the physical classroom, rather than remote learning, is the approach best calculated to optimize Jane Doe's benefit from the middle school experience, and to help Jane overcome the anxiety that has so far hampered that experience.

*Id.* ¶ 6.

## III.  THE PARTIES' POSITIONS ON WHETHER DISMISSAL IS APPROPRIATE

### A.  The Does' Allegations

Put succinctly, the Does allege that "[b]y denying Jane the identical remote access utilized by other students in the District, Defendants are discriminating against Jane on the basis of her mental health disability."  *Compl.* ¶ 164.  They further allege that "[p]art of Defendants' motive for this denial and for the edict that the Does not enter MSK with Jane is retaliation for Ms. Doe's written and oral advocacy around the issues of reductions in band instruction and the Does' continuing advocacy for Jane's disability-related needs to be addressed."  *Id.* ¶ 165.

### B.  Terri Cooper and Anita Bernhardt's Motion to Dismiss

Dr. Terri Cooper and Anita Bernhardt, the individual Defendants, move to dismiss the Does' complaint against them because Count III, which asserts that they are liable under 42 U.S.C. Section 1983, "does not plausibly allege that either of them acted with retaliatory animus."[2]  *Defs.' Mot. to Dismiss* at 1.

Defendants say that "[t]o state a claim for retaliation in violation of the First Amendment, a plaintiff must show that '(1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant,

---

[2]      Dr. Cooper and Ms. Bernhardt also move to dismiss Counts I and II insofar as they are brought against them because Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act, the claims in Counts I and II, do not provide for individual liability.  *Defs.' Mot. to Dismiss* at 1.  In their response, the Does clarify that they "do not dispute that Counts I and II are asserted solely against Defendant RSU 21 and not against the Individual Defendants."  *Pls.' Opp'n* at 3 n.3.

      The Court accepts the Plaintiffs' clarification and concession and dismisses Counts I and II.  The Court addresses only arguments related to Count III, the claim brought under 42 U.S.C. § 1983, in its analysis of the Individual Defendants' motion to dismiss.

and (3) the protected conduct was a substantial or motivating factor in the adverse action.'" *Id.* at 6 (citing *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012)). In Defendants' view, the Does' Complaint "is flawed because the Plaintiffs have pled no facts supporting the proposition that their 'protected conduct was a substantial or motivating factor in the adverse action'—the denial of their accommodation request." *Id.* at 7.

Defendants submit that "[w]here a retaliation claim is asserted against a public official, the allegations are legally insufficient to state a claim if they are consistent with the conclusion that the official was 'simply fulfilling [her] duty.'" *Id.* at 8 (second alteration in original) (citing *Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 143 (1st Cir. 2016)). Homing in on the education context, they add that "the First Circuit has said that an 'inadequate or unreasonable response to a request that parents make" may not, without more, 'fairly be characterized as retaliation.'" *Id.* (citing *Falmouth Sch. Dep't v. Doe ex rel. Doe*, 44 F.4th 23, 48 (1st Cir. 2022)).

Defendants say that "the allegations that … relate to the Individual Defendants do not even hint at frustration, animus, or retaliatory motive." *Id.* at 9. Moreover, they say, "the Complaint contains little information about the Individual Defendants' role in the decision the Plaintiffs are challenging." *Id.* By Defendants' estimation, "the Complaint alleges, at most, that Defendants Cooper and Bernhardt were insufficiently responsive to the Plaintiffs's concerns about their daughter's needs." *Id.* Insofar as the Does might claim this inadequate communication suggests animus, Defendants say that argument is belied by Plaintiffs being in "constant

communication with many other employees closer to the situation," as "required under school policy." *Id.*

Furthermore, Defendants argue that even if "school administrators might punish a parent for her public criticism of a curriculum change by denying her middle-school child an accommodation her disability requires . . . the allegation has nothing to do with either Defendant Cooper or Defendant Bernhardt." *Id.* at 10. Instead, "the Plaintiffs allege in the Complaint that it was a school board member, *not* either of the Individual Defendants, who engaged with Ms. Doe on the band instruction issue." *Id.* (emphasis in original).

Next, Defendants contend that "[e]ven if there were enough in the Complaint to generate a plausible inference that the Individual Defendants bore any animus to the Plaintiffs, the Complaint also fails to plausibly allege the required causal connection between such animus and the adverse action." *Id.* To the contrary, they say, "Plaintiffs' own statements make clear, the school's in-person policy *predated* their advocacy." *Id.* at 11 (emphasis in original) (citing *Compl.* ¶¶ 36, 61). However, Defendants aver, "[a] plaintiff 'cannot prove retaliation by pointing to a course of action by an employer that predates the [plaintiff's] oppositional conduct.'" *Id.* (citing *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 277-78 (1st Cir. 2022)).

Finally, Defendants say there is no allegation that RSU 21 *"changed* its approach to the Plaintiffs' requests after they engaged in such advocacy." *Id.* (emphasis in original). Defendants argue this fact distinguishes the present case from *Pollack v. Regional School Unit 75*, 12 F. Supp. 3d 173 (D. Me. 2014), in which

58

this Court ruled the temporal sequence at issue—an adverse action after advocacy—made it at least plausible the advocacy motivated the change in behavior. *Id.*

### C.   The Does' Opposition

The Does argue they "have alleged sufficient facts to permit a reasonable inference of retaliatory motive on the part of the Individual Defendants." *Pls.' Opp'n* at 4.

The Does contend that it is permissible for plaintiffs to "link each particular defendant to the alleged violation of federal rights . . . by indicating any 'personal action or inaction [by the defendants] within the scope of [their] responsibilities that would make [them] personally answerable in damages under Section 1983.'" *Id.* at 5 (quoting *Cruz v. Puerto Rico Plan. Bd.*, 99 F. Supp. 3d 249, 256 (D.P.R. 2015) (quoting *Pinto v. Nettleship*, 737 F.2d 130, 133 (1st Cir. 1984)). "Importantly," the Does add, "direct proof of a retaliatory motive is not essential to make out a prima facie case." *Id.* (quoting *Hannon v. Beard*, 645 F.3d 45, 49 (1st Cir. 2011)). Instead, they contend, "[c]ircumstantial evidence, including temporal proximity, can serve as evidence of retaliatory motive." *Id.* at 5-6 (citing *Hannon*, 645 F.3d at 49 ("In some instances, circumstantial evidence (say, temporal proximity between a protected act and an adverse action, falsification of institutional records, or deviation from standard operating procedures) may suffice"), *Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002) ("temporal proximity . . . may serve as circumstantial evidence of retaliation"), and *Pollack*, 12 F. Supp. 3d at 188).

The Does outline five discrete examples of times they engaged in protected speech and represent that their "protected advocacy was consistently followed in close

temporal proximity by adverse action in the form of denying accommodations requested for Jane that Defendants provided for other students." *Id.* at 7.  They add that "[o]n at least two occasions, Bernhardt directly made the denial." *Id.* (citing *Compl.* ¶¶ 84, 137).

"Furthermore," the Does argue that while much of their direct communication has been with subsidiary-level school officials, "Defendants Bernhardt and Cooper were aware of their advocacy and were the ultimate decisionmakers concerning the denial of the remote access accommodation.  School staff and the school board repeatedly directed the Does to Cooper and Bernhardt." *Id.* at 8 (citing *Compl.* ¶¶ 68, 96, 159).  However, when the Does reached out to Ms. Cooper, "she consistently refused to answer any of their communications." *Id.* at 9.

At bottom, the Does maintain that "[b]ased on the facts alleged in the Complaint—and the temporal proximity between the Does' protected conduct and Defendants' adverse actions—it is plausible that the Individual Defendants' adverse actions were motivated by retaliation for the Does' written and oral advocacy." *Id.*

### D.    Terri Cooper and Anita Bernhardt's Reply

Defendants clarify that they "do *not* contend that the Plaintiff's claim necessarily fails in the absence of 'direct proof,'" but add that this "is not to say that a plaintiff can state a claim of retaliation without identifying *any* evidence of improper motive." *Defs.' Reply* at 1 (emphasis in original).

Defendants contend the Does' temporal proximity argument "proves too much." *Id.* at 2.  This is so, Defendants say, because:

Whenever a member of the public engages in advocacy, asking an employee of the government to do something that will benefit her, there are two options: the government employee can grant the request or deny it. In most circumstances, presumably, the answer comes fairly close in time to the advocacy. If the Plaintiffs here are right—that the temporal relationship between their request for an accommodation and RSU 21's denial of the request, by itself, gives rise to an inference of retaliatory animus—then the same is true of every disagreement between a government official and a member of the public. The official's refusal to give a constituent what she wants would invariably be close enough in time to the request that an action for retaliation would be viable.

*Id.*

Defendants also reject the Does' argument that the *Pollack* Court "did not explicitly say that 'a change in approach was necessary to show that protected conduct was a motivating factor for the adverse action.'" *Id.* at 3 (quoting *Pls.' Opp'n* at 6 n.5). Defendants say "the *Pollack* Court presumably understood that it could not infer discrimination if the evidence was that the defendant simply continued to do what it has been doing *before* the plaintiffs engaged in protected activity." *Id.* (emphasis in original). Defendants say that since RSU 21's position since COVID has remained that it generally does not offer virtual options for students, and there is no allegation it "*initiated* new discriminatory action against Plaintiffs, or that the district *intensified* its opposition to their request for a 'virtual option,' after they engaged in advocacy for Jane[,] the Court may not . . . infer the existence of retaliatory motive." *Id.* at 4 (emphasis in original).

Defendants also argue that the Court "may not infer a retaliatory motive from the fact that a different student, who may be in a different school and have a different disability, has been accommodated by being allowed to learn remotely." *Id.* (emphasis omitted). In their view, "[t]hat argument hinges on the premise that if any other

61

student is entitled to remote learning as an accommodation for his or her disability, Jane Doe must be entitled to the same accommodation for hers," which is "wrong as a matter of law." *Id.* Defendants add:

> Because every accommodation claim is fact-specific, it is not enough for a plaintiff who alleges that her request for accommodation was the result of retaliatory animus, but who lacks direct proof of that animus, to allege generally that another person was granted that accommodation. She must allege that the person who got the accommodation she was denied was a true comparator.

*Id.* at 5 (collecting cases). Defendants aver that despite this need for a true comparator, "the Complaint contains no information whatsoever about any other disabled student who has been afforded the accommodation of remote learning." *Id.* at 6.

## IV.   MOTION TO DISMISS LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To state a claim, a complaint must contain, at minimum, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausible means "'something more than merely possible' or 'merely consistent with a defendant's liability.'"

62

*Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted) (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Evaluating the plausibility of a claim is a "'context-specific' job that compels [judges] 'to draw on' [their] 'judicial experience and common sense.'" *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679).

This is a "two-step analysis." *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements"). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)).

## V.   MOTION TO DISMISS DISCUSSION

42 U.S.C. § 1983 provides a civil cause of action against any person "who, under color of any statute, ordinance, regulation, custom, or usage, of any State. . ., subjects, or causes to be subjected, any citizen of the United States...to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." The Does

allege that Dr. Cooper and Ms. Bernhardt, acting under color of state law, retaliated against the Does for their advocacy by denying their daughter Jane an accommodation that was provided to other students in the District, and thereby violated their First Amendment rights to free speech and to petition for redress of grievances. *Compl.* ¶¶ 178-82.

"State actors, including both school districts and individual school officials, 'offend the First Amendment when they retaliate against an individual for constitutionally protected speech.'" *Pollack*, 12 F. Supp. 3d at 188 (quoting *González-Droz v. González-Colón*, 660 F.3d 1, 16 (1st Cir. 2011)). The question, then, is whether the Does' Complaint, with all reasonable inferences drawn in their favor, plausibly states a claim that they faced such retaliation. *See Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

To establish a prima facie case of First Amendment retaliation, a plaintiff must show: (1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *Pollack*, 12 F. Supp. 3d at 188 (citing *Esposito*, 675 F.3d at 43 (internal citations omitted)).

As far as constitutionally protected conduct, the Does allege five specific instances in which they engaged in conduct protected by either the Free Speech Clause or the Petition Clause of the First Amendment:

> (1) when Ms. Doe published an opinion column advocating against school cuts in August 2023; (2) when Ms. Doe emailed the school board and attended school board meetings to advocate against those cuts; (3) when the Does, on may separate occasions from September 2023

through December 2023, requested accommodations for Jane in person and via email with school officials—including in emails sent directly to Defendants Cooper and Bernhardt and at a Section 504 team meeting with Berhardt; (4) when Mr. Doe addressed Cooper at a public forum in October 2023; and (5) when Ms. Doe advocated for Jane before the school board in October 2023.

*Pls.' Opp'n* at 7; *see Compl.* ¶¶ 18-21, 46, 58, 61-67, 70, 74, 76,78, 92-93, 97-100, 107-21, 129-33, 137-48, 159.   Dr. Cooper and Ms. Bernhardt do not dispute that these instances constitute speech protected by the First Amendment.

The adverse action at issue is the District denying Jane Doe an accommodation that it was providing to at least one other student.  Dr. Cooper and Ms. Bernhardt also do not challenge that this is a plausibly alleged adverse action.  The Court assumes this meets the definition of an adverse action for First Amendment purposes. *See, e.g., Currier v. Town of Gilmanton*, 621 F. Supp. 3d 233, 258 (D.N.H. 2022) ("An adverse action [for purposes of a First Amendment retaliation claim] is an action that would deter a reasonably hardy person from exercising his or her constitutional rights").

Instead, the parties focus their arguments on the third factor: whether the protected conduct was a substantial or motivating factor in the adverse action.  Dr. Cooper and Ms. Bernhardt say the Does do not plausibly allege that either of them acted with retaliatory animus.   *Defs.' Mot.* at 1, 9-12.  They contend that "the Complaint contains little information about the[ir] role in the decision," *id.* at 9, and that "the allegations that do relate to [them] do not even hint at frustration, animus, or retaliatory motive."  *Id.*  Dr. Cooper and Ms. Bernhardt add that it was not them, but "a school board member . . . who engaged with Ms. Doe on the band instruction

issue." *Id.* at 10.   Finally, they say that even if the Court could infer there was animus, the Complaint "fails to plausibly allege the required causal connection between such animus and the adverse action." *Id.*   This is so, the Individual Defendants argue, because the District's in-person policy predated the Does' advocacy, such that the Does' Complaint does not contain any allegation that the District changed their approach after the protected advocacy. *Id.* at 11.

The Does retort that their "protected advocacy was consistently followed in close temporal proximity by adverse action in the form of denying accommodations requested for Jane." *Pls.' Opp'n* at 7.   They point out that Bernhardt directly made the denial on at least two occasions, in addition to failing to respond to Grahamtastic, the telepresence robot provider, after receiving paperwork. *Id.* at 7-8.   "Furthermore," the Does add, "while much of [their] direct communication has been with subsidiary-level school officials, Defendants Bernhardt and Cooper were aware of their advocacy and were the ultimate decisionmakers concerning the denial of the remote access accommodation." *Id.* at 8.   In fact, they add, "[s]chool staff and the school board repeatedly directed the Does to Cooper and Bernhardt." *Id.* (citing *Compl.* ¶¶ 68, 71, 96, 110, 159).   The Does also represent that "[i]t would be impossible at this stage for [them] to ascertain Bernhardt's and Cooper's subjective motivations for denying Jane's requested accommodation with certainty; this is precisely why the threshold for pleading a claim under Rule 12(b)(6) is so low." *Id.* at 9 n.7 (citing *MacDonald v. Brewer Sch. Dep't*, 651 F. Supp. 3d 243, 263 (1st Cir. 2023)).

In their reply memorandum, Dr. Cooper and Ms. Bernhardt contend the Does' proximity argument is overstated; otherwise, any "official's refusal to give a constituent what she wants would invariably be close enough in time to the request that an action for retaliation would be viable." *Defs.' Reply* at 2. They then reiterate their contention that a Court can "not infer discrimination if the evidence was that the defendant simply continued to do what it has been doing *before* the plaintiffs engaged in protected activity." *Id.* at 3 (emphasis in original). Finally, the Individual Defendants contend that the Does must present a true comparator to argue Jane received differential treatment, which is impossible given the fact-specific nature of accommodations. *Id.* at 4-6.

The Individual Defendants are correct that the Does have pointed to no direct evidence of retaliatory animus. However, the law of this Circuit does not require direct evidence. *See Hannon*, 645 F.3d at 49 ("Of course, direct proof of a retaliatory motive is not essential to make out a prima facie case"). Rather, "[i]n some instances, circumstantial evidence (say, temporal proximity between a protected act and an adverse action, falsification of institutional records, or deviation from standard operating procedures) may suffice." *Id.*

The District's abrupt change in policy to no longer allow the Does to accompany Jane into MSK is one such adverse action, temporally proximate to the Does' protected advocacy. After having permitted the Does for months to enter school premises as Jane's "visitors," the District informed the Does at a 504 Team meeting on December 19, 2023 that they would not be permitted to sign in and stay on the

premises. *Ms. Doe Decl.* ¶¶ 157-58. This change would begin in January, giving Jane only five days to acclimate to a full drop-off schedule. *Id.* A reasonable juror can reasonably infer that this deviation, and the District's threat that things could "get ugly" if the Does do not comply, *id.* ¶ 158, might have been made in retaliation for their continued advocacy for Jane.

It is not evident from the record how exactly RSU 21's policy against virtual learning functions. RSU 21 says that the no virtual policy has been in place since the end of the COVID-19 pandemic. *Defs.' Reply* at 4. However, the Does allege that the District allowed another student to use a virtual option, namely a telepresence robot during the 2023 school year. *Compl.* ¶¶ 135-36. At that point, it becomes unclear how one child can use a virtual option while Jane cannot if the District-wide policy is that *no* child gets a virtual option. Was this other child given access to the telepresence robot before or during COVID, and has merely continued to use it? Was the child granted the accommodation post-COVID despite the no virtual option policy? In either case, if, as the Does allege and the Court must accept as true at this stage of the proceeding, another child had the precise virtual option the Does requested for their child, the District's assertion that they have a uniform policy against virtual learning is unconvincing, as the reality does not match the policy, suggesting a "deviation from standard operating procedures." *Hannon*, 645 F.3d at 49. While the parties focus on the temporal proximity between the Does' advocacy and the adverse actions that follow, that proximity is only one of many pieces of circumstantial evidence that could support the inference of animus.

Viewing other circumstances in the Does' favor also supports a plausible inference of animus.  The District repeatedly told the Does that a virtual option was impossible, even after the Does presented evidence that they knew for a fact it was not only possible, but was contemporaneously being provided to another student. Also odd is the District's inconsistency.  *Compare Compl.* ¶ 98 ("Ms. Bratter insisted that the District was not giving any student remote access to a classroom, nor would it be willing to do so") and *Compl.* ¶ 130 ("There are no students currently receiving remote access.  There are absolutely no students receiving remote access") with *Compl.* ¶ 133 ("some students that will have digital remote access due to medical things"); *compare also Compl.* ¶ 95 ("So as far as the special education piece is concerned, there isn't anything to do a special education evaluation on") with *Compl.* ¶ 124-28 (referring Jane to a special education evaluation).

Ultimately, there may very well be reasons why exceptions to a standard policy are made, and the fact-intensive nature of granting accommodations could certainly play into that.  Further, leaders of school districts are charged with the management of complex, wide-ranging, and demanding duties that understandably might lead them to be unresponsive to specific parental concerns.

That said, at the motion to dismiss stage all reasonable inferences are drawn in favor of the Does.  Viewed in that light, the facts suggest a different story: that the daughter of someone who advocated against the District's policy was denied an accommodation she needed—as her doctor determined—while someone else's child was granted that very same accommodation.  To cover up the inconsistent policy, the

District repeatedly told the Does that it was not possible, denied them a special education referral,[3] and the ultimate decisionmakers—Dr. Cooper and Ms. Bernhardt—ignored or denied the Does repeated pleas without a reasonable explanation.

The Court also considers the fact that the Does' advocacy for their daughter has not been confined to internal protests within the District's administration. Although Mr. and Ms. Doe made their positions clear to multiple members of the District's administration, Ms. Doe in particular published her criticism of the District in local newspapers, drawing a public response from one of the members of the School Board, accusing Ms. Doe of spreading misinformation. Moreover, Ms. Doe made repeated appearances before the School Board itself criticizing District policy and complaining about the lack of responsiveness of Dr. Cooper and Ms. Bernhardt. Of course, the School Board is the entity charged with hiring and overseeing the Superintendent and high administrative officers. Also, Ms. Doe went to a public forum and directly confronted Dr. Cooper at the forum.

Given no satisfying explanation and the plausibly contentious relationship between the Does and the District, the Does' claim that the District's leaders, Dr. Cooper and Ms. Bernhardt, denied their request as a form of retaliation is as plausible

---

[3] The Court is aware, based on the District's submissions in response to the motion for preliminary injunction, that the issue of a special education referral is more complicated than the allegations in the Does' Complaint allege. Ms. Bratter says in her sworn declaration that at the October 24, 2023 504 Team meeting, there was a recommendation for a special education referral and that Mr. and Ms. Doe later refused to give their permission to allow the referral. *Bratter Decl.* ¶¶ 35, 37, 39. Nevertheless, for purposes of the motion to dismiss, the Court's review is restricted to the allegations in the complaint, and the Court has not considered Ms. Bratter's declaration in ruling on the motion to dismiss. *See García-Catalán*, 734 F.3d at 103.

as them having denied it because it was the correct decision as an educator.  In short, while there is no direct proof of retaliatory animus, "the allegations of the complaint make the claim as a whole at least plausible." *Ocasio-Hernandez*, 640 F.3d at 13; *cf. MacDonald*, 651 F. Supp. 3d at 263 (stating that smoking gun proof is not required to survive a motion to dismiss).  As such, the Court dismisses without prejudice Dr. Cooper and Ms. Bernhardt's Motion to Dismiss for Failure to State a Claim.

The Court turns to the Does' motion for a preliminary injunction that directs the Defendants to permit Jane remote access to her school through a telepresence robot.

## VI.   THE PARTIES' POSITIONS ON INJUNCTIVE RELIEF

### A.   The Does' Motion for Preliminary Injunction

The Does "request that the Court enter a preliminary injunction permitting Jane remote access to her school classrooms (through the accommodation of a telepresence robot, as the District has allowed to other students with disabilities in RSU 21)." *Pls.' Mot.* at 1.  They believe this will allow Jane time to acclimatize herself to her classrooms given her anxiety disorder.  *Id.*  The Does contend they are "entitled to such relief as the denial of access amounts to discrimination against Jane on the basis of her disability and is currently causing Jane irreparable harm due to the loss of educational services." *Id.* at 1-2.  The Does acknowledge that as the moving party they bear the burden of establishing that the four preliminary injunctive relief factors weigh in their favor.  *Id.* at 4.

The Does believe the first factor, likelihood of success on the merits, weighs in their favor as they are likely to prevail on the merits.  *Id.*  The Does say that under

71

either Title II of the Americans with Disabilities Act or Section 504 of the Rehabilitation Act, which "are subject to the same legal framework," *id.* at 5, they can succeed on a so-called "failure-to-modify" claim. *Id.* at 7 (citing *Pollack*, 12 F. Supp. 3d at 187 for the proposition that "the plaintiff must show that the defendant's denial of a requested modification prevented the plaintiff from participat[ing] or enjoying the benefits of the defendants' services, programs, or activities, or otherwise subjected the plaintiff to discrimination" (modification in *Pls.' Mot.*)). This is so, they contend, because RSU 21 has denied Jane her requested accommodation despite the fact that "RSU 21 has identified [Jane] as a student with a disability requiring accommodations under federal law," "Jane's pediatrician has provided RSU 21 with a letter stating that Jane's anxiety is so severe that it is medically necessary for her to have video access to her classroom," and "[t]here is a telepresence robot available at no cost to the District." *Id.* at 8. Due to this denial, Jane "remains unable to access most of her middle school classes" and "unable to progress meaningfully toward being integrated with her classroom peers." *Id.* at 9.

As far as the second factor, irreparable injury, the Does cite several cases, including *Brown v. Board of Education*, 347 U.S. 483 (1954), to support their argument that "loss of educational opportunity is an injury not compensable by damages" and "[i]ts loss, therefore, is irreparable in the legal sense." *Id.* at 9-10. In Jane's case, the Does argue the harm is not only educational but also includes lasting and ongoing harm to her personal development and mental health, including two new diagnoses attributed to the added distress of the past school year's events. *Id.* at 10-

11.  The Does also assert that no other avenue of relief remains available to them following their failed attempts for Jane to be granted this accommodation with the 504 Team, MSK Principal, RSU 21 Director of Special Education, Dr. Cooper, and Ms. Bernhardt.  *Id.* at 11-12.

The Does contend the third factor, the balance of the equities, "tips strongly in Jane's favor."  *Id.* at 12.  The Does say "the harm to Jane in the absence of injunctive relief is and continues to be severe."  *Id.*  Meanwhile, "[l]ittle if any harm … would befall Defendants were RSU 21 to allow her to use a telepresence robot, just as it has done for at least one other student in the district this school year."  *Id.* at 12-13.

Finally, on the fourth factor, the Does argue that issuing the injunction would better serve the public interest than a denial, as there "is a significant public interest in eliminating discrimination against individuals with disabilities."  *Id.* at 13 (collecting cases).  Further, "[t]he injunctive relief would ensure Jane has access to the technology she requires, as recommended by her physician, to accommodate her disability and thereby participate fully in public school."  *Id.* at 14.

### B.    Defendants' Opposition

Defendants point out that the Does' motion "focuses exclusively on Plaintiffs' Section 504 and ADA claims" and indicate their "opposition follows suit."  *Defs.' Opp'n* at 2.  Defendants submit "that Plaintiffs cannot meet their burden of proving the four requirements necessary for a preliminary injunction."  *Id.*

Defendants argue the Court "should not exercise its extraordinary injunctive power to substitute its judgment for the judgment of experienced school administrators and educators about how best to help a student achieve the goal of

73

attending school full time in-person." *Id.* at 5. Discussing the accommodation process, Defendants state that "[p]arents are part of the 504 team and may request at any time that a plan be reviewed and/or revised as needed." *Id.* at 7. However, "when parents specifically request certain accommodations for their child under Section 504, a school is not obligated to grant the preferred accommodations. Instead, the school is obligated the review the request, identity the specific needs of the student, and discuss the reasonable accommodations that would address those needs." *Id.* (internal citations omitted).

Defendants assert that "RSU has taken a thoughtful, measured approach, endorsed by trained clinicians, to integrate Jane into the schoolhouse." *Id.* at 9. They add that "[a]lthough the process has not been without setbacks, the overall result has been an increase in Jane's attendance." *Id.* Meanwhile, Defendants say, RSU 21 "has ensured that Jane has access to the academic supports she may need," including a virtual academy, tutoring in and outside of the middle school, and the opportunity to attend classes from the hallway when she feels unable to attend in person. *Id.*

By Defendants' estimation, "RSU 21's denial of the Does' requests for a telepresence robot does not mean that it has discriminated or is discriminating against Jane. Rather, it is evidence of a good-faith, reasoned disagreement between the parties." *Id.* This is a disagreement which Defendants believe they have the better part of through "reasoned professional judgment" that informs an approach "congruent with the law's mandate." *Id.* (citing 45 C.F.R. § 84.34). In addition, Defendants aver "Plaintiffs have produced no competent evidence – whether from a

doctor, a therapist, or an educator – that the approach adopted by RSU 21 is unreasonable." *Id.* An accommodation is not "unreasonable," Defendants opine, "just because parents disagree with it." *Id.* at 10.

In response to Plaintiffs' contention that the District's accommodation of a different student, in a different school, by permitting that student to use a telepresence robot is evidence of discrimination, Defendants reiterate their argument about the lack of a true comparator. *Id.* The Does' allegations, Defendants counter, do not demonstrate that the child using a telepresence robot "was or is comparable to Jane." *Id.* at 11. Defendants say, "the law does not require uniformity – it requires individualized decision-making." *Id.* at 10. As a result, "[n]othing in the Complaint, therefore, will support an inference that Jane is being denied a tool *she* needs, because of *her* particular disability, if she is to avail herself of RSU 21's educational program." *Id.* at 11 (emphasis in original).

Discussing the likelihood of irreparable harm, Defendants say that "[u]nlike the cases where courts have found irreparable injury, Jane has not been excluded from school." *Id.* at 12. To the contrary, Defendants argue, "RSU 21 has gone to great lengths to include Jane in school each and every day." *Id.* Moreover, Defendants say, "there is no actual, viable, presently existing threat of serious harm," *id.* (citing *Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991)), because with her current accommodations of partial days and a tutor, "Jane is not at serious risk of falling behind, as her parents allege." *Id.* at 13.

75

As far as the equities, Defendants argue that the Does' contentions of the harms Jane will suffer if the Court does not intervene are "counter-intuitive, factually unsupportable, or both." *Id.* at 14. First, Defendants assert that remaining at home will not give Jane greater access to the classroom than being physically present in school. *Id.* Second, Defendants say the Does "offer no competent evidence" Jane is falling further behind; in fact, "the claim is contradicted by the Declarations of both the school Principal and the Director of Special Services." *Id.* Third, Defendants say the Does "do not, and cannot, explain how Jane would be better able to 'forge friendships' sitting at home." *Id.* Fourth, Defendants aver the Does fail to acknowledge that the School Social Worker "counseled them that Jane's continued withdrawal from interaction with her peers would just prolong and worsen her anxiety, not cure it." *Id.*

Turning to the harm to the District, Defendants say "the harm is real[:] [s]chool administrators, educators, and clinicians have a legitimate interest in being afforded the opportunity to exercise their informed, expert judgment, free of unwarranted judicial intervention." *Id.* Defendants contend "it would be harmful for the Court to enter a blanket order requiring remote access via telepresence r[obot]" because the Court cannot match the Board-Certified Behavioral Analysts' level of precision "and could inadvertently undercut the work that the RSU 21 Special Services Department and MSK educators, counselors, and specialists have been building on all year." *Id.* at 15.

76

Finally, Defendants contend that "[w]here, as here, it is plain that school professionals are carrying out their educational responsibilities diligently and thoughtfully, the public interest is best served by permitting them to do their jobs." *Id.*

### C.   The Does' Reply

As far as likelihood of success on the merits, the Does argue "[t]here can be no question that Jane satisfies the essential elements of a successful ADA/504 claim." *Reply* at 3. The Does see the issue as "RSU 21's refusal to grant the accommodation that is forcing Jane to spend so many hours at home trying to teach herself sixth grade courses rather than being instructed and interacting with her teachers and classmates like her non-disabled peers." *Id.* at 4.

The Does contend that "[i]t is clear from the admitted allegations of the Complaint that RSU 21 has denied this accommodation to Jane without discussing its efficacy or her need for the accommodation to obtain equal access to classroom instruction." *Id.* at 2. The Does then point out that "[d]espite acknowledging that the denial came from the district's top leaders—not Jane's 504 Team, based on consideration of her disability and individual circumstances—RSU 21 has presented no testimony from either of them." *Id.* They add that "[t]he individuals submitting declarations for RSU 21 lack the authority even to consider Jane's request for the telepresence accommodation due to District policy." *Id.* In the Does' view, "the uncontradicted evidence demonstrates that the District members of Jane's 504 Team have been prohibited by their superiors from discussing the option of granting Plaintiffs' request for use of telepresence technology." *Id.* at 4.

The Does indicate they "do not dispute that RSU 21 has allowed other accommodations for Jane," but insist "these accommodations have not provided her with equal access to her education, as required by federal law." *Id.* at 2. As evidence of this, they aver that "the maximum number of in-class hours Jane has attended has been 12 of the total 30 classroom hours per week," that "for some classes, she has never entered the classroom at all," and that in the sixth grade, she has "received in-class instruction for only 7.7% of the available classroom hours, and hallway monitoring for another 7% of the available classroom hours." *Id.* at 3. Taken together, the Does believe they "have a strong likelihood of prevailing on their ADA and Section 504 claims." *Id.* at 6.

As far as irreparable harm, the Does reiterate that "outright loss of educational services" cannot be remedied with money damages. *Id.* Acknowledging RSU 21's argument that "Jane has attended some classes, now has a tutor available, and is being accessed by a B[oard-Certified Behavioral Analyst]," the Does stand firm in their position that "the continuing loss of classroom instruction and actual connections with teachers and peers cannot be remedied with mere dollars." *Id.* After all, they add, "[m]idle school is a critical period for child development," making "every day that Jane is excluded from most of her classes [] yet another irreparable injury." *Id.*

Regarding balancing the equities, the Does say:

The harm to Jane in the absence of injunctive relief continues to be severe, but RSU 21 argues that it would be harmed if the Court "second-guesses" its discriminatory decision to take a requested accommodation completely off the table. Judicial intervention is not "unwarranted" in

cases like this where an individual's civil rights are at stake.  The fact that the District has permitted another student with a disability to utilize the very accommodation requested for Jane—and makes no argument that this accommodation somehow negatively affected its delivery of educational services to that student—is enough to settle the balance of equities question.  The balance tips strongly in Jane's favor.

*Id.* at 7.

Turning to the public interest, the Does contend:

RSU 21's only argument on the public interest prong is to ask the Court's permission to continue denying Jane an accommodation that would provide her with equal access to the educational services she is entitled to receive.  The District has engaged in weeks of obfuscation and delay, as indicated by the facts recited in Ms. Doe's declarations.  The Court should conclude that the public interest in eliminating disability discrimination supports an award of injunctive relief here.

*Id.*

## VII.   INJUNCTIVE RELIEF STANDARD

To obtain preliminary injunctive relief, the plaintiff must satisfy four elements: "1) a likelihood of success on the merits, 2) a likelihood of irreparable harm [to the movant] absent interim relief, 3) a balance of equities in the plaintiff's favor, and 4) [that issuing the preliminary injunctive relief would be in] service of the public interest." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements*, 794 F.3d 168, 171 (1st Cir. 2015).

As the moving party, the plaintiff "bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (citing *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)).  "A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d

1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)).   While "trial courts have wide discretion in making judgments regarding the appropriateness of" preliminary injunctive relief, *Sanchez v. Esso Std. Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2010), it is well established "that the Court is to bear constantly in mind that 'an injunction is an equitable remedy which should not be lightly indulged in, but used sparingly and only in a clear and plain case.'" *Saco Defense Sys. Div., Maremont Corp. v. Weinberger*, 606 F. Supp. 446, 450 (D. Me. 1985).

## VIII.   INJUNCTIVE RELIEF DISCUSSION

As a preliminary matter, the Court is not convinced that the relief the Does request corresponds with the harm they identify.   If RSU 21 is inappropriately failing to consider an accommodation that would help support Jane, it seems to the Court that the commensurate injunctive relief would be to require RSU 21 to consider the desired accommodation.   As RSU 21 represents it is already considering the telepresence accommodation through an engaged Board-Certified Behavior Analyst, that may suffice as far as injunctive relief is concerned.   Ultimately, however, the Individuals with Disabilities Education Act (IDEA) "allows a court to 'grant such relief as the court determines is appropriate.'" *Mr. I. v. Me. Sch. Admin. Dist. 55*, 416 F. Supp. 2d 147, 168 (D. Me. 2006).   With this note, the Court turns to whether the Does have proven to the Court that a grant of injunctive relief is warranted.

### A.   Likelihood of Success on the Merits

Section 504 of the Rehabilitation Act requires that schools provide students who have a qualified disability with a free, appropriate public education.   34 C.F.R. §

104.33.   This Section requires "the provision of regular or special education and related aids and services that . . . are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons."  34 C.F.R. § 104.33(b)(1).   Much like Section 504, the ADA requires equal access in education.  *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.101 *et seq*.

The Does bring a specific type of claim that courts have previously recognized under the ADA and Section 504: a failure-to-modify claim.  *See Pls.' Mot.* at 7-9.  "In a failure-to-modify claim brought under Title II of the ADA or the Rehabilitation Act, the plaintiff must show that the defendant's denial of a requested modification prevented the plaintiff from participat[ing] in or enjoying the benefits of the defendants' services, programs, or activities, or otherwise subjected the plaintiff to discrimination."  *Pollack*, 12 F. Supp. 3d at 187 (internal quotations omitted) (citing 42 U.S.C. § 12132; and *Theriault v. Flynn*, 162 F.3d 46, 48 n. 3 (1998)); *see also Kropp v. Me. Sch. Admin. Union #44*, 2007 WL 551516, at *16 (collecting cases).  "The plaintiff must also show that the requested modification was 'reasonable.'" *Pollack*, 12 F. Supp. 3d at 187 (citing 42 U.S.C. §§ 12131(2), 12132).

RSU 21 accepts that Jane Doe qualifies as a handicapped individual and that it has denied the modification that she and her parents requested: a telepresence robot.  *See Defs.' Opp'n* at 8-9.   RSU 21 has also not made the argument that the modification is unreasonable. *See Id.*  As the Does point out, the modification is feasible and is most likely practical; after all, the robot would be provided free of charge, Grahamtastic confirmed it had a robot available to be dropped off at Jane's

school, and RSU 21 has managed to integrate a telepresence robot in another one of its schools. *Pls.' Mot. at 2-3*; *Ms. Doe Decl.* ¶ 147; *Reply at 1*. The narrow point of contention between the parties is whether RSU 21 denying Jane her requested accommodation prevents her from participating in or enjoying the benefits of schooling or is otherwise discriminatory. The Court accordingly focuses its analysis of the Does' likelihood of success on the merits on this issue.

The Does' argument boils down to their assertion that the "failure to provide a necessary accommodation violates the ADA and Section 504, so Jane possesses a strong likelihood of prevailing on the merits of her federal disability discrimination claims." *Pls.' Mot.* at 9. The Does relate that Jane's pediatrician has said "it is medically necessary for her to have video access to her classroom," *id.* at 8, that the telepresence robot "will permit Jane to participate in classroom activities and interact with her instructors and peers remotely," *id.*, that no other accommodations have "moved the needle substantially," *id.* at 9, and that Jane "remains unable to access most of her middle school classes." *Id.*

After citing First Circuit caselaw that states judicial deference is owed to school officials' discretionary decisions, Defendants argue "discretion is particularly apt here." *Defs.' Opp'n* at 5 (citing *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 29 (1st Cir. 2020)). RSU 21 says that "a school is not obligated to grant the preferred accommodations. Instead, the school is obligated to review the request, identify the specific needs of the student, and discuss the reasonable accommodations that would address those needs." *Id.* at 7 (internal citation omitted).

Caselaw does not clearly indicate where the line lies for determining whether a District has failed to provide accommodations that allow a child to participate in and enjoy the benefits of schooling. *S.S. ex rel. S.Y. v. City of Springfield*, 318 F.R.D. 210, 220 (D. Mass. 2016) ("The ADA does not specify how public entities must meet their general obligation to provide equal access"). That said, the Supreme Court has interpreted Section 504 as requiring that a "qualified handicapped individual . . . be provided with meaningful access to the benefit that the grantee offers." *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *accord Rusaki v. Pistole*, 775 F.3d 61, 78 (1st Cir. 2014). To demonstrate likelihood of success on the merits, then, the Does must show that the District denying Jane the requested accommodation prevents her from having meaningful access to the benefits of schooling.

That Jane has only attended 7% of her classes in person and been in the hall for another 7.7% of her classes is compelling evidence that Jane does not have meaningful access to the benefits of schooling. The Defendants retort that they have taken "a thoughtful, measured approach, endorsed by trained clinicians, to integrate Jane into the schoolhouse," including offering instruction through a virtual academy, access to tutoring inside or outside of school, classroom instruction when she can manage to enter and hallway instruction when she cannot. *Defs.' Opp'n* at 9. They also attempt to undermine the importance of the note from Jane's pediatrician saying that she needs a virtual option, noting the pediatrician is "*not* a mental health professional." *Id.* at 10 (emphasis in original). Defendants also say that "Jane's

83

parents, like the Court itself, may not substitute their judgment for the informed judgment of experienced clinicians and educators." *Id.*

The Court suspects that a student whose disability limits her school attendance to approximately fifteen percent of classroom hours may well be "excluded from participation" or "denied the benefits of the services, program, or activities" of RSU 21. 42 U.S.C. § 12132. The Court also acknowledges the Does' conviction that a telepresence robot could help their daughter gain meaningful access to her education. *See Irving Independent Sch. Dist. v. Tatro*, 468 U.S. 883, 891 (1984) ("A service that enables a handicapped child to remain at school during the day is an important means of providing the child with the meaningful access to education that Congress envisioned)."

However, based solely on a written record, the Court concludes that the Does have not met their burden of proof. In evaluating their argument, the Does fail to articulate a cognizable standard for when an action "exclude[s a qualified person] from participation," or how the District failed to meet this standard in the present case. Further, the Does point to the use of a telepresence robot by another student elsewhere in the District as evidence of discrimination against Jane. However, the Does provide no evidence that this other student suffers from the same disability as Jane. Moreover, as the District has written, it appears that the other student is enrolled in elementary school, where students generally stay in the same classroom during the school day, not middle school where the students move from classroom to classroom. Assuming the other student has a distinct qualifying condition, "[t]here

is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons." *Traynor v. Turnage*, 485 U.S. 535, 549 (1988).

Simply put, there are too many unanswered questions for the Court to order a preliminary injunction at this stage. The Court is having trouble envisioning exactly what the Grahamtastic robot even looks like, much less how Jane Doe proposes to use the robot at school. The Court accepts that Jane Doe's parents are earnestly seeking what is in their view in their child's best interest. But the Court cannot sustain a demand for injunctive relief based on their view alone. Even though the parents presented the views of Jane Doe's physician about Jane's need for accommodation, Jane's doctor is not an educational professional and her medical view cannot carry the day for injunctive relief against the District. This is particularly so because the District has educational specialists who have plausibly contended that the better path for Jane Doe is to overcome her anxiety by slowly integrating her into the classroom without the aid of a robot.

While a precipitous drop from a child attending school full-time one year to less than fifteen percent of the time the next year seems like good indication the child is not meaningfully participating in and enjoying the benefits of schooling, the Court cannot conclude that the Does are likely to succeed on the merits of their claim because the facts are not adequately developed to meet their burden. As the movants, the Does bear the burden of establishing this factor weighs in their favor. *Mr. I. v. Me. Sch. Admin. Dist.* 55, 416 F. Supp. 2d 147, 175 (D. Me. 2006), *aff'd sub nom. Mr.*

85

*I. ex rel L.I. v. Me. Sch. Admin. Dist. No. 55*, 480 F.3d 1 (1st Cir. 2007) (citing *Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005)).  They have failed to do so.  This factor, thus, weighs against granting preliminary injunctive relief.

### B.  Likelihood of Irreparable Harm, Balance of Equities, and the Public Interest

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc., v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

The Court acknowledges the Does' concern that their daughter is suffering irreparable harm in the absence of a telepresence robot to assist her in transitioning to classroom learning, and also recognizes the District's view that its plan of action without the robot is the better way to minimize the harm to Jane Doe.  Nevertheless, as the Does have not demonstrated their likelihood of success on the merits, the Court does not engage in "idle curiosity" by wading into the remaining factors.  *Id.*

### C.  Injunctive Relief Synopsis

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank*, 672 F.3d at 8-9 (quoting *Voice of the Arab World*, 645 F.3d at 32).  As the moving party, the Does bear the burden of establishing that the four preliminary injunctive relief factors weigh in their favor. *Monroig-Zayas*, 445 F.3d at 18.  The Court concludes the Does have not met this burden on the written record currently before the Court.  While the Court has "wide discretion in making judgments regarding the appropriateness of" preliminary

injunctive relief, *Sanchez*, 572 F.3d at 14, the Court concludes this is not "a clear and plain case" warranting the grant of this extraordinary remedy.  *Weinberger*, 606 F. Supp. at 450.

## IX.    COMMENT

To a large extent, the differing results in these two motions are a function of the procedural constraints that determine the Court's differing approaches to each. To address the District's motion to dismiss, the Court must consider only the allegations in the Complaint, which are summarized in Ms. Doe's sworn declaration. Faced with only her version of the events and the District's obligation to sustain its dismissal arguments, the Court readily concludes that the District is not entitled to have the Complaint dismissed as against Dr. Cooper and Ms. Bernhardt.  By contrast, when evaluating the motion for preliminary injunction, the Court has considered not just the Does' perspective, but also the District's responses.  To evaluate the merits of the motion for preliminary injunction, the Court faces fundamental evidentiary conflicts between the parties that are not readily resolved in favor of the Does, who bear the burden of proof.

Moreover, the motions are directed to different questions.  The individual Defendants' motion to dismiss asks whether the Does are able to sustain a retaliation claim against the individual Defendants, based on the allegations in their Complaint. Viewing the allegations and reasonable inferences from the Complaint, the Court has concluded that the Complaint cannot be dismissed as against Dr. Cooper and Ms. Bernhardt.  The Does' motion for preliminary injunction demands that the Court assess the merits of whether the Court should order the Does' preferred solution to

their daughter's anxiety condition against the preferred solution of an array of the District's educational experts.

Combining the procedural constraints of each motion with the differing facts the Court must consider in each motion, the Court readily concludes that the movants in each motion have failed to sustain their respective burdens. Unfortunately, the result leaves the parties where they started.

## X.   SUMMARY

The Court considered two motions for relief. One is a motion to dismiss for failure to state a claim brought by the two individual Defendants, Dr. Terri Cooper and Anita Bernhardt. Based on the Plaintiffs' concession, the Court grants the motion to dismiss Counts I and II as against Dr. Cooper and Ms. Bernhardt, but the Court dismisses without prejudice their motion to dismiss Count III, because the Does' allegations are sufficient to state a plausible claim of First Amendment retaliation. The other motion is a motion for preliminary injunctive relief brought by the Plaintiffs, Mr. and Ms. Doe, individually and on behalf of their minor daughter, Jane Doe. The Court dismisses without prejudice this motion because the Does failed to demonstrate that the four injunctive relief factors weigh in their favor.

## XI.   CONCLUSION

The Court GRANTS in part and DISMISSES in part without prejudice Anita Bernhardt and Terri Cooper's Motion to Dismiss for Failure to State a Claim (ECF No. 22). The Court GRANTS the Motion to Dismiss Counts I and II of the Plaintiffs' Complaint and DISMISSES without prejudice the Motion to Dismiss Count III of the Complaint.

The Court DISMISSES without prejudice Mr. and Ms. Doe's Motion for Preliminary Injunction (ECF No. 5).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 6th day of September, 2024